Ronald WOODS, Petitioner–Appellant,

v.

Richard L. DUGGER,
Respondent–Appellee.

No. 89–3420.

United States Court of Appeals,
Eleventh Circuit.

Feb. 5, 1991.

Billy H. Nolas, Larry H. Spalding, Office of the Capital Collateral Representative, Tallahassee, Fla., for petitioner-appellant.

Gary L. Printz, Richard B. Martell, Dept. of Legal Affairs, Tallahassee, Fla., for respondent-appellee.

Before KRAVITCH, JOHNSON and CLARK, Circuit Judges.

JOHNSON, Circuit Judge:

This case is an appeal from the district court's denial of Ronald Woods' petition for a writ of habeas corpus.

## I. FACTUAL BACKGROUND

This case arose out of a disturbance at the Union Correctional Institution in Union County, Florida on May 5, 1983. Woods and his co-defendant, Leonard Bean, attacked a number of correctional officers at the prison, including John Dennard. Woods, who was eighteen at the time, stabbed and killed Dennard.

**Trial**

On June 7, 1983, Woods and Bean were indicted for first degree murder. The joint trial began on September 26, 1983. On September 30, 1983, the jury returned guilty verdicts against both Woods and Bean.[1] On October 1, 1983, the trial court conducted an advisory sentencing proceeding. Woods presented the testimony of a court appointed psychologist, Dr. Harry Kropp, that Woods had an I.Q. of 69 which placed him in the mild range of mental retardation. The jury voted seven to five that Woods should receive the death penalty.

The trial court then sentenced Woods to death. The judge found two statutory aggravating circumstances: Woods committed the murder while incarcerated, and the crime impeded the operation of the correc-

tional system. See Fla.Stat.Ann. § 921.141(5)(a) and (g). The trial judge found one statutory mitigating circumstance: Woods' age. See id. at (6)(g). The judge rejected Woods' argument that Woods did not have the mental capacity to appreciate the criminality of his conduct or to restrict his actions to the requirements of law. See id. at (6)(f).

**Appeals and Collateral Attacks**

Woods appealed his conviction and sentence directly to the Florida Supreme Court, which affirmed the trial court. Woods v. State, 490 So.2d 24 (Fla.1986). On November 10, 1986, the United States Supreme Court denied certiorari in the direct appeal. Woods v. Florida, 479 U.S. 954, 107 S.Ct. 446, 93 L.Ed.2d 394 (1986). On October 5, 1987, the Governor of Florida signed a death warrant to be carried out on December 10, 1987.

On November 6, 1987, Woods filed a motion in the trial court for post-conviction relief pursuant to Fla.R.Crim.P. 3.850. The trial court denied the motion on December 1, 1987. On December 9, 1987, the Florida Supreme Court stayed the execution of the death warrant. On July 14, 1988, however, the court affirmed the lower court and dissolved the stay. On October 17, 1988, the Governor signed a second death warrant, scheduling execution for the week of November 10, 1988. Woods v. State, 531 So.2d 79 (Fla.1988).

Woods filed the present action, his first federal habeas corpus petition, on November 2, 1988.[2] The district court stayed execution of the death warrant in order to consider the petition and allow an appeal to

---

1. The jury convicted Woods on all five counts. Bean was sentenced to life imprisonment.

2. The petition presents 13 claims for relief:
 (1) that the trial court's failure to remove the large number of uniformed correctional officers from the courtroom violated the Sixth, Eighth, and Fourteenth Amendments;
 (2) that the exclusion of black jurors violated the Eighth and Fourteenth Amendments;
 (3) that the trial court's refusal to continue the case violated the Sixth, Eighth, and Fourteenth Amendments;
 (4) that the trial court's refusal to continue the case in order to allow a pre-penalty-phase investigation and trial counsel's failure to discover crucial mitigating evidence violated the

Sixth, Eighth, and Fourteenth Amendments and Woods's right to a competent mental health evaluation under the Fourteenth Amendment;
 (5) that execution of an eighteen-year-old with the mental age of a twelve-year-old violates the Eighth Amendment;
 (6) that the trial court erred in instructing the jury that it must consider Woods's mental problems as aggravating circumstances;
 (7) that the trial transcript was unreliable, violating the Sixth, Eighth, and Fourteenth Amendments;
 (8) that the trial court failed to consider Woods's mental deficiencies as non-statutory

this Court. The district court denied Woods' request for an evidentiary hearing on the petition, but on December 20, 1988, held oral argument. The district court rejected all of Woods' claims, except the claim that the trial court failed to consider nonstatutory mitigating evidence in violation of *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1986). The district court granted the petition on the *Hitchcock* claim, ordering the trial court to resentence Woods within 180 days and to take into account all mitigating evidence as well as the jury's recommendation of death. 711 F.Supp. 586.

Both Woods and the state appealed to this Court. The state, however, did not seek a stay of the district court's order pending appeal. Instead, the state arranged for the trial court to resentence Woods on April 23, 1989. The trial court considered evidence dating back to the crime and evidence that had come to light after the prior sentence. Finding that the two statutory aggravating circumstances (crime committed while in prison, and crime inhibiting operation of prison) outweighed the one statutory mitigating circumstance (youth) and the nonstatutory mitigating circumstances, the trial court again sentenced Woods to death. This Court then dismissed the state's cross-appeal as moot in light of the new sentence.

On May 24, 1990, the state filed a motion with this Court to relinquish jurisdiction so that the district court could amend its judgment under Fed.R.Civ.P. 60(b) in order to take into account the new sentence. The Court granted the motion on June 5, 1990. On July 13, 1990, the district court amended its prior judgment and denied Woods' petition on all claims. This appeal is from that judgment.

mitigating circumstances in violation of the Sixth, Eighth, and Fourteenth Amendments; (9) that the prosecution improperly urged the jury and the trial judge to consider the victim's close relationship with the prosecutor and the trial judge; (10) that the prosecutor's references to Woods's decision not to present evidence violated the Fifth, Sixth, Eighth, and Fourteenth Amendments; (11) that the trial court improperly lessened the jury's sense of responsibility during the

## II. ANALYSIS

 In this appeal, Woods alleges that he was denied a fair trial due to the hostile atmosphere in the small rural community in which the trial took place and to the number of prison guards who attended the trial in full uniform. In this case we face a situation which was foreshadowed by dictum from the Supreme Court in *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986). The *Holbrook* Court held that some courtroom security did not violate the defendant's Sixth Amendment right to receive a fair trial. However, the Court wrote, "[w]e do not minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial." *Id.* at 570, 106 S.Ct. at 1346.

 The due process clause of the Fourteenth Amendment guarantees the right of state criminal defendants to be tried by an impartial jury. The Fourteenth Amendment incorporates the essence of the Sixth Amendment right to be tried "by a panel of impartial, 'indifferent' jurors [whose] verdict must be based upon the evidence developed at the trial." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961) (citations omitted). As Chief Justice Warren noted in his concurrence in *Estes v. Texas*, 381 U.S. 532, 552, 85 S.Ct. 1628, 1637, 14 L.Ed.2d 543 (1965) (Warren, C.J., concurring) due process requires the courts to safeguard against "the intrusion of factors into the trial process that tend to subvert its purpose." *Id.* at 560, 85 S.Ct. at 1641. Specifically, the courts must guard against "the atmosphere in and around the courtroom [becoming] so hostile as to interfere with the trial process, even though ... all the forms of trial conformed

penalty phase of the trial, violating the Eighth and Fourteenth Amendments; (12) that trial counsel was incompetent in failing to argue for severance on the ground that Bean's lawyer had a conflict of interest; (13) that the trial court improperly considered Woods's juvenile offenses and prison disciplinary reports as aggravating circumstances in violation of the Sixth, Eighth, and Fourteenth Amendments.

*Woods v. Dugger,* 711 F.Supp. 586, 591–92 n. 8 (M.D.Fla.1989).

to the requirements of law ...." *Id.* at 561, 85 S.Ct. at 1642.

There have been several cases in this Court, as well as in the Supreme Court, where criminal defendants have raised the issue of being denied a fair trial due to various incidents harming the "trial process" of which Chief Justice Warren spoke in *Estes v. Texas. Id.* at 560, 85 S.Ct. at 1641. While some of the cases have focused on questionable security precautions during the trial, *see, e.g., Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340; *Elledge v. Dugger*, 823 F.2d 1439 (11th Cir.), *modified in part by* 833 F.2d 250 (11th Cir.1987), and other cases have focused on pretrial publicity, *see, e.g., Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Coleman v. Kemp,* 778 F.2d 1487 (11th Cir.1985), we decline to artificially divide these cases into two separate lines of analysis. Instead we follow the command of the Supreme Court in *Sheppard v. Maxwell* and examine the "totality of circumstances," *Sheppard,* 384 U.S. at 352, 86 S.Ct. at 1517. Therefore, we evaluate the fairness of Woods' trial in light of both pretrial publicity and occurrences taking place during the trial.

■ In order for Woods to prevail on his claim of being denied a fair trial he must show either actual or inherent prejudice.[3] *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986); *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The test for inherent prejudice is "not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play.'" *Holbrook v. Flynn*, 475 U.S. at 570, 106 S.Ct. at 1346 (quoting *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48

L.Ed.2d 126 (1976)). This test requires us to examine two factors: first, whether there is an "impermissible factor coming into play" and second, whether it poses an "unacceptable risk." The Ninth Circuit has found one example of an impermissible factor. In *Norris v. Risley*, 918 F.2d 828 (9th Cir.1990), the court determined that spectators at a kidnapping and rape trial who were wearing buttons inscribed with the words "women against rape" posed an impermissible factor, "[b]ecause the buttons ... conveyed an implied message [of guilt], and because the buttons were not subject to the constitutional safeguards of confrontation and cross examination, they are clearly the sort of 'impermissible factors' that courts must ensure receive no weight." *Id.* at 830.

We also must examine the record to determine if these impermissible factors posed an "unacceptable risk." The *Williams* Court held that a risk becomes unacceptable when there is a "probability of deleterious effects." *Williams,* 425 U.S. at 504, 96 S.Ct. at 1693. Should Woods be able to prove actual or inherent prejudice due to the presence of the uniformed prison guards then the state must justify their presence with an "essential state interest specific to [the] trial." *Holbrook,* 475 U.S. at 569, 106 S.Ct. at 1346.[4]

Turning to the record, we note that the trial was held in Union County, Florida. Union County is a small rural county in Northern Florida. Just over ten thousand people live in Union County, but one-third of those are prisoners. Tate Rose, *What Life is Like in a Place Where Half the Residents are Behind Bars*, Chicago Tribune, October 21, 1985, at Tempo Sect. p. 1, col. C. In the neighboring counties of Bradford and Union there are four state

---

3. The state claims that *Holbrook v. Flynn* requires the petitioner to prove both actual and inherent prejudice. The state points to the Court's statement that "if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." *Flynn,* 475 U.S. at 572, 106 S.Ct. at 1347–48. We decline to follow the state's approach. First, such a reading would be a dramatic change in the law as initially set out in *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), and we decline to infer such

a *sub silentio* change. Second, such a reading makes little sense. If the petitioner can prove actual prejudice nothing is gained by making him also prove inherent prejudice. We also note that the Ninth Circuit has recently interpreted *Flynn* to allow the petitioner to prove either actual or inherent prejudice. *See Norris v. Risley,* 918 F.2d 828 (9th Cir.1990).

4. There is no similar justification which would rebut allegations of pretrial publicity. *See Sheppard v. Maxwell, supra.*

prisons which employ twenty-two hundred workers, and the prisons are responsible for $71 million of the local economy. Stuart, *A Town's Fact of Life: The Death Row Prison*, New York Times, April 6, 1984 at Sect. A, p. 14, col. 1. The Florida Statistical Abstract also reports that Union County is one hundred percent rural, *Florida Statistical Abstract* 3 n. 2, 13 (Shermyen, ed. 1989), and that thirty-two hundred people are employed outside of the home. *Id.* at 171.

The jury was drawn exclusively from Union County. Richard Dugger, the State Secretary of Corrections, told the *New York Times*, in a reference to the town of Starke in neighboring Bradford County, "The only time the community takes note of what's going on at the prison ... is when a guard is killed." Nordheimer, "Town Pays Little Mind to Executions," *New York Times*, Sept. 8, 1984, at Sect. 1, p. 6, col. 3.

Union County took note of the murder of Corrections Officer Dennard. Prior to his death, he was interviewed by the *St. Petersburg Times*. He told the paper that the Union Correctional Institution was dangerously understaffed and that he wanted to be transferred because he feared for his safety as a prison guard. Officer Dennard's death became a focal point for the lobbying efforts of a group called the United Correctional Employees in their demands for the government to hire more correctional officers. *United Press International*, June 23, 1983. After Officer Dennard's death, his sister began a petition that she reported was "going like hot cakes" and had gathered hundreds of signatures. *United Press International*, May 28, 1983. By the time of Mr. Woods' trial, defense counsel told the court that the petition had 5,000 signatures, not all of which, however, were from Union County residents. The petition stated "its [sic] time we started punishing the guilty and protecting the innocent" and demanded the death penalty for those who kill prison guards. *Id.*

The effect of the killing on this community is evidenced in the answers obtained on voir dire.[5] Of the forty-one potential jurors excused either peremptorily or for cause, six immediately excused themselves. Consequently, the record reveals no information about these six. Of the remaining thirty-five potential jurors who were eventually excused: thirty-three had relatives or close friends who worked in the prison, or the jurors had worked in the prison themselves; twenty-one of the excused jurors had heard of the case; nine knew a witness; and one was a witness who was not called by either side. Within the actual jury: four jurors and one alternate juror neither had heard of the case nor had any relatives working in the prison system; four jurors had not heard of the case, but had either worked in the prison system themselves or had relatives currently working in the system; three jurors and one alternate juror both had heard of the case and had relatives currently working in the system; and, finally, one juror had heard of the case but had no relatives or friends working in the system.[6]

In addition, the gallery of the courtroom was filled with spectators. The defense counsel raised several objections to the presence of prison guards in the gallery, and the court ordered a videotape and photographs taken of the gallery. The photos reveal that the gallery had four rows which could each seat about ten or eleven people. Virtually every seat was occupied, and several people were standing in the back of the courtroom. About half of the spectators appear to be wearing prison guard uniforms.[7]

The state attempts to downplay the significance of the spectators in two ways.

---

**5.** First, it should be noted that current prison employees were excluded from the potential venire.

**6.** As a side note, an example of how small the county was, the jury contained one juror who

was the mother of another juror and a juror who knew the husband of another juror.

**7.** Woods also alleges, and the state has not denied, that there was excessive security utilized as a show of force at the trial. Woods claims

The state argues: (1) most of the officers in the gallery were witnesses who testified in uniform at trial, and (2) the officers were present only during closing arguments.

The state's first argument is not factually supported. The state is correct in noting that fourteen corrections officers testified at trial. And, the state is correct in that the trial court noted just before closing argument that "many of the uniformed persons in the courtroom, that I have observed, are persons who testified in their uniform during the course of the trial." The court's comment can be true only about the gallery during closing arguments. We must infer from the record that there was a substantial number of non-witnesses present in uniform prior to closing arguments because at the close of evidence, the day before closing argument, the defendant moved for a mistrial on the basis of the large number of officers in the audience. At this point, none of the witnesses were present in the gallery because the rule of sequestration had been invoked at the start of the trial and the state explicitly maintained the rule for all its witnesses up until closing arguments. Moreover, the fact that the witnesses testified in uniform at trial[8] does not lessen the prejudice of their showing up in uniform to hear closing arguments at a later time.[9] The prejudice does not depend on whether the uniformed guards were witnesses or not. The prejudice arises from the presence of the uniformed corrections officers in the context of a trial being held in the midst of an angry community.

The state makes the additional claim that the audience was present only during closing arguments. By examining the record, it is clear that uniformed guards were present in the gallery at the very least during voir dire, closing argument, and

throughout the sentencing phase of the trial. The record is replete during those portions of the trial with the trial judge's comments to the spectators telling them when the trial will resume following breaks and requesting them to be in their seats before the jury returns. The trial judge also at times admonished the crowd to remain quiet and not make audible responses. Furthermore, the judge told the spectators to go to the lobby while the jury deliberated during the guilt phase. The record also reflects that spectators, including the uniformed guards, were present during the trial, despite the lack of admonitions from the bench, because the closing arguments were not made until Friday morning, yet the defense counsel made their objection and moved for a mistrial at the close of all the evidence on Thursday evening.

This Court has in the past noted that presumed prejudice rarely occurs and "is reserved for extreme situations." *Bundy v. Dugger*, 850 F.2d 1402 (11th Cir.1988). The case at hand is one of those "extreme" cases. While the pretrial publicity may not be sufficient to rise to the level where we can presume prejudice to Mr. Woods, the publicity must be viewed in the context of the complete trial. Unlike the trial disputed in *Bundy*, Woods' trial was marred by the presence of uniformed spectators in the courtroom as well as by the pretrial publicity. Viewing the totality of the circumstances, we have no choice but to conclude that there was "an unacceptable risk [of] impermissible factors coming into play." *Holbrook v. Flynn*, 475 U.S. at 570, 106 S.Ct. at 1346.

The officers in this case were there for one reason: they hoped to show solidarity with the killed correctional officer. In part, it appears that they wanted to communicate a message to the jury.[10] The

that there were guards with shotguns on the courthouse roof, on the courthouse steps and in the courthouse lobby. Woods claims that the jurors had to walk through this fortress-like atmosphere every day. While these allegations may or may not be true, we do not rely on them to reach our conclusion.

**8.** Evidence was taken only on Tuesday, Wednesday, and Thursday.

**9.** Closing arguments were heard on Friday.

**10.** It is a mistake, however, to weigh the First Amendment speech rights of the officers against the Sixth Amendment rights of Mr. Woods, for that case is not before this Court. We express no opinion on whether the trial court may muzzle the free speech of the officers. We only hold that if the officers choose to speak in the manner that they chose—the Sixth Amendment rights of Mr. Woods are violated.

message of the officers is clear in light of the extensive pretrial publicity. The officers wanted a conviction followed by the imposition of the death penalty. The jury could not help but receive the message.

■ It is the purpose of the Sixth Amendment to guarantee the defendant a fair trial in which the jury reaches its verdict based only on the evidence subjected to the crucible of the adversarial process.[11] While this Court realizes that no trial can be perfect, some errors so prejudice the process that reviewing courts are unable to conclude that the verdict was based only on the evidence presented. Faced with such an error, we hold that the record demonstrates that the pretrial publicity combined with the large number of uniformed spectators rose to the level of inherent prejudice, thereby depriving the petitioner of a fair trial.[12]

The Supreme Court in *Holbrook v. Flynn* held that after a showing of prejudice resulting from the presence of uniformed officers, the state may rebut the showing with a showing that the officers furthered an "essential state interest." 475 U.S. at 568–69, 106 S.Ct. at 1346. The state in the present case does not, and cannot, justify the presence of the uniformed corrections officers. The corrections officers were not present to escort any prisoners and they were not part of the courtroom security. Moreover, all testimony was concluded the day before oral arguments; therefore the officers were present on their own time and not as witnesses. Section III.C. of the Department of Corrections Policy and Procedure Directive regarding employees uniforms and clothing states that "the uniform ... is not to be worn during off-duty hours or when the employee is not acting in an official capacity, except when traveling to and from work." Under department rules, therefore, no state interest can justify the uniformed presence of these off-duty correctional officers.

■ The state, however, argues that the evidence of guilt is so overwhelming that any error was harmless. This argument was foreclosed by this Court's holding in *Coleman v. Kemp*, 778 F.2d at 1541 in which we held that a denial of a fair trial can never be harmless because the right is so fundamental to our notion of due process. The Supreme Court recently wrote that "[s]ome constitutional violations ... by their very nature cast so much doubt on the fairness of the trial process that, as a matter of law, they can never be considered harmless." *Satterwhite v. Texas*, 486 U.S. 249, 256, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284 (1988). We hold that harmless error analysis is inapplicable to a claim of a denial of a fair trial.

## III. CONCLUSION

The petitioner also raises an ineffective assistance of counsel claim and an erroneous denial of a continuance claim, both of which appear to merit evidentiary hearings in the district court. However, in order to avoid issuing an advisory opinion we will not reach these questions. The record in this case is sufficient to demonstrate that the defendant was denied a fair trial. There is no need for an evidentiary hearing in the district court on this claim.[13] We conclude that petitioner Woods has met the extremely high standard necessary for a successful claim of presumed prejudice.

---

**11.** The Sixth Amendment imposes an obligation upon trial courts to minimize any risk of "unacceptable factors" affecting the accused's right to have a fair trial. This obligation is clearly distinct from any trial court authority that is derived from state statutes, *see, e.g., Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), or from the courts' inherent contempt power. *See, e.g., In Re Little*, 404 U.S. 553, 92 S.Ct. 659, 30 L.Ed.2d 708 (1972) (per curiam). As should be clear from the facts of this case, the actions of the spectators and the effect of the pretrial publicity deprived Woods of his Sixth Amendment right to a fair trial, yet no one alleges that it amounted to contemptible conduct.

**12.** We do not mean to imply that presumed prejudice can occur only when there is a combination of courtroom demonstrations and pretrial publicity.

**13.** The record is clear that the officers were in the gallery for extended periods during the trial. The state has not contested any of the underlying facts upon which we rely. It, therefore, is clear that a remand for an evidentiary hearing would be a waste of judicial resources.

We therefore REVERSE the decision of the district court and REMAND the case to the district court with instructions to issue the writ of habeas corpus conditioned on the state's right to retry the petitioner within a reasonable time.[14]

14. This Court notes that a resentencing hearing was held on April 23, 1989. The record of this hearing reflects that the gallery of the courthouse was once again filled with a large group of uniformed corrections officers. A change of venue would eliminate or at least minimize this problem.