UNITED STATES of America, Plaintiff,

v.

Yahweh Ben YAHWEH, et al., Defendants.

No. 90–868–CR–NCR.

United States District Court, S.D. Florida.

Jan. 2, 1992.

Richard Scruggs, Gertrude Novicki, Asst. U.S. Attys., Miami, Fla., for plaintiff.

Alcee L. Hastings, Patricia G. Williams, Miami, Fla., Paul McKenna, Coconut Grove, Fla., Richard Gagliano, Miami, Fla., Steven Kassner, Coral Gables, Fla., Albert Z. Levin, Dennis Kainen, Wendell Graham, Charles White, Miami, Fla., Michael Smith, Fort Lauderdale, Fla., Kathy Hamilton, Miami, Fla., Ellen Leesfield, Coconut Grove, Fla., Rayfield McGee, Curtis Jones, Thomas Buscaglia, Glenn Feldman, Chris Mancini, Miami, Fla., for defendants.

ROETTGER, Chief Judge.

In this nineteen defendant racketeering conspiracy case against a religious organization known as The Nation of Yahweh and its leader, Yahweh Ben Yahweh (translated as Jehovah, the son of Jehovah), plus eighteen of its members for sixteen alleged homicides, arson by firebombing of a neighborhood in Delray Beach, extortion, etc., the court has concern about the possible intimidating effect upon the jury of a large number of spectators in the religious garb of the Defendants.

The victims of the alleged homicides fall into three groups: white men, mostly vagrants, who were allegedly killed to satisfy an initiation requirement to become a member of the Yahwehs' Temple of Love inner circle; the charge is that some defendants had to kill a "white devil" and bring back a body part as proof. The second group comprised people who obstructed Yahweh Ben Yahweh's acquisition or control of apartment dwellings in Opa Locka; and the third group allegedly comprised members of the Nation of Yahweh who were dissidents or fell out of favor with Yahweh Ben Yahweh and were executed as a means of enforcing church discipline, including such methods of execution as beheading.

I

The court first became concerned about this at an early status conference in the case when the court counted more than sixty persons in the spectator section of the courtroom wearing the traditional Yahweh garb, which is all white, with a white turban and a long white robe for most of them. This Fort Lauderdale courtroom is the largest working courtroom in the District.[1] Subsequent status conferences had 40 to 60 persons in Yahweh attire, heightening the concern.

The court's concern was about the possible intimidating effect upon a jury in a four month long trial, or longer, with charges in the indictment of such violent crimes and conduct when the spectator area would apparently be saturated with a sea of spectators garbed in a white "uniform" of sorts.

The court considered what action a trial judge should take if the defendants in a criminal case with extensive charges of violent crimes were members of the Ku Klux Klan and the spectator section would be filled with persons wearing white robes and white peaked hats. Or, what action would have been appropriate in a case with charges of violent crimes against members of the American Nazi Party in decades past and most of the spectators wore khaki shirts with Nazi armbands? The action required of the trial judge would be clear: permit spectators only who were not wearing such "uniforms" because of the possible intimidating effect or influence upon the jury.

When this court raised the possibility at a subsequent status conference, Mr. Hastings[2], counsel for the lead defendant, Yahweh Ben Yahweh, questioned whether this judge would consider such requirements on spectators' clothing if the defen-

---

1. The ceremonial courtroom in Miami is larger overall, but this courtroom is the only standard federal size courtroom in the district at 60' × 40', but it has a very large working area of 40' × 40', which has greatly diminished the spectator section's size. In fact, the working area of this Fort Lauderdale courtroom is roughly twice the size of the Miami ceremonial courtroom's working area.

   The ceremonial courtroom in Miami is the only other courtroom in the district large enough to accommodate this trial and it is occupied by the case of *U.S. v. Noriega*, (former head of Panamanian government); the *Noriega* trial was set for trial twice previously at the same times the instant case had been set for trial and both cases were continued twice.

2. Formerly judge of the United States District Court of this District.

dants were nuns of the Roman Catholic Church or clergymen of various denominations wearing a clerical collar and nuns or clergy attended the trial in support of the defendants.

The answer simply is that if the charges were similar in scope and violence to the ones in the instant case, then requiring spectators to appear in clothing other than their habits would be appropriate because of the possible influence or intimidating effect upon the jury.

Two court cases shed some light on this subject. In *Woods v. Dugger*, 923 F.2d 1454 (11th Cir.1991), the spectator section was half-filled with correctional officers and the victim in the homicide case was a prison guard. The correctional officers were also prison guards and wore their uniforms in the courtroom. The court observed that the officer-spectators "... were there for one reason: they hoped to show solidarity with the killed correctional officer. In part, it appears that they wanted to communicate a message to the jury." *Id.* at 1459. The court expressed concern about any harmful effect to the "trial process" and reversed the conviction of the petitioner.

Similarly, the Ninth Circuit reversed a Montana conviction of a defendant charged with rape. In the Montana trial, a large number of women were present wearing "Women Against Rape" buttons in the courtroom, the public elevator, and elsewhere in the courthouse. The defendant moved to exclude the women from the courtroom during the trial or to prevent them from wearing the buttons, but the trial court denied the motions. The conviction was reversed. *Norris v. Risley*, 918 F.2d 828 (9th Cir.1990).

Although the spectators in the instant case are not opposing the defendants on trial, but, in fact, support the defendants,

that is not a difference which would require a different result.

Fairness of the trial process is the key, the nub and heart of this question. The public is entitled to a fair trial also, and so is the government.

This court has an obligation to ensure that the trial is a fair process and most certainly has an obligation to protect jurors from any possibility of influence or intimidation by the appearance of a turbaned, white-robed sea of spectators.

The court intends that the nearest thing to a uniform allowed in the courtroom will be the judge's robe or the blue jackets worn by a few court security officers in attendance. No witnesses, including the almost exclusively Metro–Dade Department of Public Safety witnesses who will be testifying in this trial will be permitted inside the courtroom or on the witness stand in uniform.[3] Friends or supporters of defendants are not excluded from the courtroom, but are barred from wearing their "uniform" in the courtroom.

## II

■ The issue of Defendants' clothing raises another question. Defendants have asked to wear their turbaned "uniforms"[4] and at a status conference Defendants objected that requiring them to wear the traditional clothing of the inmates of the Metropolitan Correctional Center in Miami (M.C.C.) would reveal to the jury that they are presently incarcerated. In *U.S. v. Dawson*, 563 F.2d 149 (5th Cir.1977), this question was presented to the Fifth Circuit Court of Appeals, which rejected a claim that the defendant did not receive a fair trial when he was forced to appear in prison issue clothing; this clothing consisted of an ordinary khaki shirt and trousers that bore no marks identifying him as a prisoner.

---

**3.** Although this indictment was returned by a federal Grand Jury, the homicides are cases that would traditionally be tried in the State court system. Further emphasizing this is the fact that there may be no federal agents whatsoever testifying in a trial that will consume approximately four months.

**4.** Each insists he no longer has any other clothing to wear because of having worn the Yahweh clothing exclusively for years; additionally, the Criminal Justice Act will not pay for clothing for Defendants.

The prison issue clothing in this case is similar to that in *Dawson*, although occasionally defendants have worn a sweatshirt from M.C.C. However, there are no identifying marks from which one could conclude that it was prison garb.

The difficulty is that the *Dawson* case involved one defendant; whereas in this case there would be sixteen defendants similarly garbed.[5]

Consequently, this court cannot run the risk that jurors, seeing sixteen defendants in the same type of clothing day after day, would conclude that defendants were all incarcerated, thereby invoking the concerns expressed in *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976) and *U.S. v. Harris*, 703 F.2d 508 (11th Cir.1983). Although the court has some concern about Defendants' Yahweh "uniform" having an intimidating effect on the jury, such concern is outweighed by the concern about defendants' incarceration being perceived by the jury.

Consequently, Defendants may wear suitable clothing of their choice in the courtroom, whether or not it is in their best interest to wear the traditional white-robed uniforms with white turbans.[6]

DONE AND ORDERED.

**5.** Only sixteen defendants will go to trial.

**6.** In fact, defense lawyers have expressed to the news media they would prefer their clients not wear their religious garb. *Broward Review*, December 9, 1991, page 4.