VAN NORTWICK, J.
Brian Scott Long appeals his convictions of two counts of lewd and lascivious molestation and one count of sexual battery by a person in familial or custodial authority. Because men wearing jackets embroidered with “Bikers Against Child Abuse” were in the presence of jurors prior to the commencement of the trial, we conclude that inherent prejudice has been established and that there was an unacceptable risk that impermissible factors affected the jury. Accordingly, Long’s convictions are reversed, the sentences vacated, and the cause remanded for a new trial.
Long was charged with multiple counts of lewd and lascivious molestation and sexual battery of his former step-daughter. The offenses were alleged to have occurred in Duval County and to have taken place over several years; the victim did not report the offenses until several years after the offenses were alleged to have occurred. Long raises multiple issues on appeal, but it is necessary for us to address only one issue.
He argues that a new trial is required because several persons selected to serve *500 on the jury came into close proximity with men wearing leather jackets emblazoned with the phrase: “Bikers Against Child Abuse.” These men were observed sitting in a hallway with the jury on the morning trial was scheduled to commence. Prior to the start of trial, defense counsel brought the jury’s encounter with “burly” bikers to the attention of the trial court. Defense counsel asserted that a mistrial was in order, and as authority for such, cited Shootes v. State, 20 So.3d 434 (Fla. 1st DCA 2009). The prosecutor advised the trial court that these men had befriended the victim and appeared at trial in order to show support for her. The prosecutor added that she instructed the group not to wear their “paraphernalia” in the courtroom.
The trial court interviewed four of the jurors exposed to the bikers. Each juror stated that there was no conversation with the bikers, and each answered affirmatively when asked if he or she could remain impartial despite seeing the bikers. Yet, one juror was dismissed because her answer as to whether she could be impartial was deemed equivocal by the trial court. Another, Mr. Adams, was asked whether the bikers would cause him to “favor the State against the defendant in any way,” and the juror replied:
No. I would be disappointed if they were in the parking lot when we were going home. But other than that— Court: Why is that, sir?
Juror: I am being honest. I don’t think that will happen. I don’t think it will have any bearing on the case whatsoever, you know, other than what the facts are presented in here.
After the interviews and after excusing a juror, the trial court was confident that the remaining jurors would be impartial. The bikers were instructed by the trial court, outside of the presence of the jury, not to wear their “insignia” in the court room. They were also instructed not to congregate around the jurors during breaks. A mistrial was thus denied.
The jury returned a guilty verdict on all of the charges pending. The defense moved for a new trial on several grounds, including the ground that the trial court erred in denying Long’s motion for a mistrial in view of the prejudice caused by the presence of the “Bikers Against Child Abuse” group.[1] In the motion for a new trial, the defense added that the prejudice caused by the presence of the bikers was aggravated by their close proximity to the jury during the trial itself.
A hearing was granted on the motion for a new trial, at which substantial argument was received. The trial court denied a new trial noting that all of the bikers were “properly attired” during the trial and that the court was confident that the jury was not affected by the presence of the bikers in the courtroom. The prosecutor did not take exception to the observation of defense counsel, made for the record immediately upon hearing the trial court’s reasons for denying a new trial, that there were eleven or twelve bikers in the courtroom and that the people who sat closest to the jury “were members of the Bikers Against Child Abuse group,” although the trial court had the impression that some of the trial observers were members of the victim’s family.
*501 On appeal, Long argues that actual or inherent prejudice resulted from the presence of the bikers at the trial. We agree that an unacceptable risk was created that the verdict reached was, at least in part, a result of the pre-trial encounter with the insignia-laden bikers. Although the trial court appropriately questioned the jurors, at that point in the proceedings, by which time the jury members had been selected but not sworn, the trial court should have selected a new jury panel. That error was aggravated by the continued presence of the bikers in the courtroom in close proximity of the jury.
The due process clause of the Fourteenth Amendment guarantees the right of state criminal defendants to be tried by an impartial jury. Woods v. Dugger, 923 F.2d 1454, 1456 (11th Cir.1991). The Fourteenth Amendment incorporates the essence of the Sixth Amendment right to be tried “by a panel of impartial, ‘indifferent’ jurors ... [whose] verdict must be based upon the evidence developed at the trial.” Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961) (citations omitted). As Chief Justice Warren has observed, the constitutional guarantee of due process requires the courts to safeguard against “the intrusion of factors into the trial process that tend to subvert its purpose.” Estes v. Texas, 381 U.S. 532, 560, 85 S.Ct. 1628, 1642, 14 L.Ed.2d 543 (1965) (Warren, C.J., concurring). Specifically, the courts must vigilantly guard against “the atmosphere in and around the courtroom [becoming] so hostile as to interfere with the trial process, even though ... all the forms of trial conformed to the requirements of law....” Id. at 561, 85 S.Ct. at 1642.
This court explained in Shootes v. State that “[t]he presence of courtroom observers wearing uniforms, insignia, buttons, or other indicia of support for the accused, the prosecution, or the victim of the crime does not automatically constitute denial of the accused’s right to a fair trial.” 20 So.3d 434, 438 (Fla. 1st DCA 2009); see also Holbrook v. Flynn, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986); Carey v. Musladin, 549 U.S. 70, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006). However, there are situations where the atmosphere in the courtroom might infringe on the defendant’s right to a fair trial. When such a claim is raised, a case-by-case approach is required to allow courts to consider the “totality of the circumstances.” Shootes, 20 So.3d at 438 (quoting Sheppard v. Maxwell, 384 U.S. 333, 352, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966)).
As we further explained in Shootes, a defendant claiming he was denied a fair trial must show “either actual or inherent prejudice.” Id.; see also Woods, 923 F.2d at 1457. Actual prejudice requires some indication or articulation by a juror or jurors that they were conscious of some prejudicial effect. See Pozo v. State, 963 So.2d 831 (Fla. 4th DCA 2007). Inherent prejudice, on the other hand, requires a showing by the defendant that there was an unacceptable risk of impermissible factors coming into play. Holbrook, 475 U.S. at 570, 106 S.Ct. 1340, 89 L.Ed.2d 525; Woods, 923 F.2d at 1457.
Inherent prejudice has been shown here. By displaying their insignia, the bikers intended to do more than be present as support for the victim.. After all, the victim already knew the bikers. Thus, they could have provided support to her by merely being present without wearing any distinguishing clothing. Instead, in apparent contravention of the prosecutor’s instruction, the bikers chose to appear, as the morning trial was set to commence, in clothing which was intended “to communicate a message to the jury.” Woods, 923 *502 F.2d at 1459. That message was the appellant was a sexual abuser and that sexual abuse was to be condemned by a guilty verdict. As the trial court stated below, the bikers engaged in “reckless advocacy” — advocacy of a certain outcome to be reached by the jury regardless of what the State proved at trial.
We must not and do not take lightly the solemn obligation to ensure that those whose liberty is at risk are tried by a jury which feels unpressured to reach a certain verdict. A fair trial is, fundamentally, a trial free from “influence or domination by either a hostile or friendly mob. There is no room at any stage of judicial proceedings for such intervention; mob law is the very antithesis of due process.” Cox v. Louisiana, 379 U.S. 559, 562, 85 S.Ct. 476, 480, 13 L.Ed.2d 487 (1965); Frank v. Mangum, 237 U.S. 309, 35 S.Ct. 582, 59 L.Ed. 969 (1915). While we would not describe the bikers with a perjorative term such as mob, it is nevertheless the case that these individuals appeared at trial with the announced purpose of remonstrating “against child abuse.” The bikers, then, sought to send an implied message to the jury that Long should be found guilty. Such a message has no part in a trial.
Norris v. Risley, 918 F.2d 828 (9th Cir.1990), is instructive. In Norris, a number of women wearing “Women Against Rape” buttons were present in the courthouse before the start of a trial on charges of kidnapping and rape; some buttons were also observed during trial. At least three jurors saw the buttons. In ordering a new trial, the Ninth Circuit observed:
A courtroom practice or arrangement is inherently prejudicial if “an unacceptable risk is presented of impermissible factors coming into play.” [Estelle v. Williams, 425 U.S. 501, 505, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976).] Because the buttons, which were donned before any evidence was introduced, conveyed an implied message encouraging the jury to find Norris guilty, and because the buttons were not subject to the constitutional safeguards of confrontation and cross-examination, they are clearly the sort- of “impermissible factors” that courts must ensure receive no weight.
[[Image here]]
Just as the compelled wearing of prison garb during trial can create an impermissible influence on the jury throughout trial, the buttons’ message, which implied that Norris raped the complaining witness, constituted a continuing reminder that various spectators believed Norris’s guilt before it was proven, eroding the presumption of innocence. Moreover, the buttons’ message was far more direct than that to be inferred from the wearing of prison attire, which has no communicative purpose. The women who wore buttons obviously intended to convey a message.
[[Image here]]
Thus, though far more subtle than a direct accusation, the buttons’ message was all the more dangerous precisely because it was not a formal accusation. Unlike the state’s direct evidence, which could have been refuted by any manner of contrary testimony to be judged ultimately on the basis of each declarant’s credibility, the buttons’ informal accusation was not susceptible to traditional methods of refutation. Instead, the accusation stood unchallenged, lending credibility and weight to the state’s case without being subject to the constitutional protections to which such evidence is ordinarily subjected.
918 F.2d at 830-33 (footnotes omitted). There is nothing in Norris which suggests *503 that a certain number of buttons or displays of insignia must be demonstrated before inherent prejudice can be found. As noted, only three jurors appeared to have seen the “Women Against Rape” buttons in Norris.
The dissent argues that the case before us, which involves the conduct of private spectators, should be treated differently than a case where prejudice against the accused is the result of state-sponsored activity. We fail to see a merit in that distinction for the issue before us is whether there was a risk that Long was denied the right to a trial “by a panel of impartial, ‘indifferent’ jurors ... [whose] verdict [was] based upon the evidence developed at the trial” and not upon outside pressures. Irvin, 366 U.S. at 722, 81 S.Ct. at 1642. It matters not whether the impartiality of the jury was adversely affected by a state agent or a private citizen, for the result is the same: a denial of a fair trial.
Further, we do not find the cases cited by the dissent to compel a different result. The dissent cites Carey v. Musladin, 549 U.S. 70, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006), noting that the question of whether conduct by a private spectator at trial can be found to be inherently prejudicial has been unanswered by the United States Supreme Court. That the U.S. Supreme Court has not drawn a distinction between private and state-sponsored conduct which adversely affects the impartiality of a jury suggests that no distinction should be drawn here.
In Carey, the U.S. Supreme Court considered the question of whether a holding by a state court-that the display of buttons bearing a murder victim’s image did not deny the defendant a fair trial — “was contrary to or an unreasonable application of clearly established federal law.” 549 U.S. at 72, 127 S.Ct. at 651. Justice Thomas, writing for the majority, held the holding of the state court was not contrary to clearly established federal law because federal law on the question is not clearly established.
The dissent also cites Bell v. State, 965 So.2d 48, 69 (Fla.2007), in support of affir-mance. Bell is not dispositive. The appellant in Bell, who was under sentence of death, raised a claim of ineffective assistance of trial counsel in a motion for post-conviction relief. More particularly, the appellant in Bell argued trial counsel was ineffective for failing to get “a conclusive ruling” on his motion to strike the entire jury venire because of the presence during voir dire of a spectator wearing a t-shirt “memorializing and depicting one of the victims.” Id. The trial court inquired of the venire panel, and while some saw the t-shirt, none knew who was depicted on it; also, all of them indicated that the t-shirt would not influence their verdict. The Florida Supreme Court denied that trial counsel was ineffective under these circumstances.
Unlike Bell, the case at bar is not a collateral attack, but a direct appeal of his conviction. We therefore are not asked to consider whether trial counsel for Long performed at a level “below an objective standard of reasonableness ... under prevailing professional norms.” Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct. 2052, 2064-65, 80 L.Ed.2d 674 (1984). Instead, we are asked to consider whether, given the totality of circumstances, there was an unacceptable risk that the jury was influenced by factors beyond the evidence adduced. See Shootes, 20 So.3d at 440. These are two very different considerations.
The dissent cites as well Buckner v. State, 714 So.2d 384 (Fla.1998). Buckner does not compel a different result here. In Buckner, a juror came forward during a *504 first degree murder trial to say that she saw spectators holding up photographs. While none of the jurors saw two eight-by-ten photographs, two saw a small collage of photographs. The defendant moved for a mistrial, which was denied. The Florida Supreme Court did not reverse noting that the photographs were nothing more than the victim pictured with others and that none of the jurors who saw the photographs “could identify who was depicted” in them. Id. at 389. Thus, the jury could not have been improperly influenced by them. Unlike the jury in Buckner, the jury in the case at bar certainly could identify what message was being conveyed by the badge: “Bikers Against Child Abuse.” As the trial court correctly observed, the wearing clothing with such a message was “advocacy.”
It is true, as the State emphasizes on appeal, that the jurors who were in close proximity to the bikers prior to trial and who remained on the panel each stated they would not be influenced by the bikers. However, such disavowals of impartiality are only proof that actual prejudice did not occur. It is by no means certain that the jury was not intimidated and thus not improperly influenced by the bikers. Justice Clark once said, “[n]o doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one’s fellows is often its father.” Irvin v. Dowd, 366 U.S. at 728, 81 S.Ct. at 1645. The same may be said in the case before us. After all, a juror’s assurance of impartiality is not “dispositive.” Murphy v. Florida, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975); see Holbrook, 475 U.S. at 570, 106 S.Ct. at 1346-1347 (“Even though a practice may be inherently prejudicial, jurors will not necessarily be fully conscious of the effect it will have on their attitude toward the accused. This will be especially true when jurors are questioned at the very beginning of proceedings; at that point, they can only speculate on how they will feel after being exposed to a practice daily over the course of a long trial.”); see also Overton v. State, 801 So.2d 877, 892 (Fla.2001). If there is any basis for reasonable doubt as to a juror’s ability to be impartial, the juror should be excused. See Ault v. State, 866 So.2d 674, 683 (Fla.2003). As trial had not commenced at the time the jury was exposed to the bikers’ insignia, the danger posed could have been easily remedied by the empaneling of a new jury. So, while the dissent argues for affirmance because “there is absolutely no evidence in the record that the jurors in this matter were in any way influenced by the presence of the bikers before or during the trial,” the lack of record evidence is not the point. Typically, there is unlikely to be evidence of record that a jury was influenced by factors beyond the evidence adduced because jurors “will not necessarily be fully conscious of the effect” of an inherently prejudicial occurrence or atmosphere at trial. Holbrook, 475 U.S. at 570, 106 S.Ct. at 1346. Thus, “[wjhenever a courtroom arrangement is challenged as inherently prejudicial, therefore, the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether ‘an unacceptable risk is presented of impermissible factors coming into play.’ ” Id., 475 U.S. at 570, 106 S.Ct. at 1346-1347 (citing Estelle v. Williams, 425 U.S. at 505, 96 S.Ct. at 1693).
A final point bears mentioning. In denying the motion for a new trial, the trial court indicated that it did not believe it had the authority to exclude “anybody from coming into the courtroom.” This view is incorrect. Safeguards may be adopted to ensure that “the administration *505 of justice at all stages is free from outside control and influence” without running afoul of the constitution. Cox, 379 U.S. at 562, 85 S.Ct. at 480. Indeed, the due process clause of the federal constitution obliges the judiciary to guard against the possibility that “the atmosphere in and around the courtroom might [become] so hostile as to interfere with the trial process, even though ... all the forms of trial conformed to the requirements of law.” Estes, 381 U.S. at 561, 85 S.Ct. at 1642 (1965) (Warren, C.J., concurring); see also Mills v. Singletary, 63 F.3d 999 (11th Cir.1995).
In conclusion, while jurors no doubt endeavor to remain impartial, a theatrical atmosphere permitted in and around a courtroom is likely to have some effect. Indeed, that some effect may result is the very reason why many trial spectators choose to adorn themselves with messages or images which favor one side or another at trial. The principle of American jurisprudence that a conviction may only be premised on the evidence presented at trial remains sacrosanct. Holbrook, 475 U.S. at 566, 106 S.Ct. at 1345; Taylor v. Kentucky, 436 U.S. 478, 485, 98 S.Ct. 1930, 1935, 56 L.Ed.2d 468 (1978); Estelle v. Williams, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). Vindication of this principle requires reversal of Long’s conviction and a remand for a new trial because there was an unacceptable risk that the bikers’ presence affected the jury’s impartiality.
REVERSED and REMANDED.
PADOVANO, J., concurs, and ROWE, J., dissents with written opinion.

. Attached to the motion for a new trial was a copy of the press release issued by the Duval County State Attorney following the trial. In the press release, the prosecutor is quoted as saying: "Justice has finally been served for the victim and her family. The victim was able to face her abuser in court today with support from her family as well as Bikers Against Child Abuse.”