965 So.2d 48 (2007)
Michael B. BELL, Appellant,
v.
STATE of Florida, Appellee.
Michael B. Bell, Petitioner,
v.
James R. McDonough, etc., Respondent.
Nos. SC02-1765, SC05-610.
Supreme Court of Florida.
June 7, 2007.
*52 Christopher J. Anderson, Atlantic Beach, FL, for Appellant/Petitioner.
Bill McCollum, Attorney General, and Meredith Charbula, Assistant Attorney General, Tallahassee, FL, for Appellee/Respondent.
PER CURIAM.
Michael B. Bell appeals an order of the circuit court denying his motion to vacate his two convictions of first-degree murder and two sentences of death filed under Florida Rule of Criminal Procedure 3.850, and petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons that follow, we affirm the circuit court's denial of the motion for postconviction relief and deny Bell's petition for a writ of habeas corpus.

I. FACTS AND PROCEDURAL HISTORY
Bell was convicted of two counts of first-degree murder. The facts as described by this Court on direct appeal are as follows:

*53 On December 9, 1993, appellant Michael Bell shot to death Jimmy West and Tamecka Smith as they entered a car outside a liquor lounge in Jacksonville. Three eyewitnesses testified regarding the murders, which the trial court described in the sentencing order as follows. In June 1993, Theodore Wright killed Lamar Bell in a shoot-out which was found to be justifiable homicide committed in self-defense. Michael Bell then swore to get revenge for the murder of his brother, Lamar Bell. During the five months following Lamar Bell's death, Michael Bell repeatedly told friends and relatives he planned to kill Wright. On December 8, 1993, Michael Bell, through a girlfriend, purchased an AK-47 assault rifle, a thirty-round magazine, and 160 bullets. The next night, Bell saw Theodore Wright's car, a yellow Plymouth. Bell left the area and shortly returned with two friends and his rifle loaded with thirty bullets. After a short search, he saw the yellow car in the parking lot of a liquor lounge. Bell did not know that Wright had sold the car to Wright's half-brother, Jimmy West, and that West had parked it and had gone into the lounge. Bell waited in the parking lot until West left the lounge with Tamecka Smith and another female. Bell picked up the loaded AK-47 and approached the car as West got into the driver's seat and Smith began to enter on the passenger's side. Bell approached the open door on the driver's side and at point-blank range fired twelve bullets into West and four into Smith. The other female ducked and escaped injury. After shooting West and Smith, Bell riddled with bullets the front of the lounge where about a dozen people were waiting to go inside. Bell then drove to his aunt's house and said to her, "Theodore got my brother and now I got his brother."
Appellant was charged with two counts of first-degree murder. At trial in March 1995, appellant pleaded not guilty by reason of self-defense, stating that he believed West had reached for a weapon just before appellant began shooting. The defense presented no evidence or witnesses. A jury found appellant guilty of the first-degree murders of Smith and West and unanimously recommended the death penalty for both murders. During the penalty phase, a lounge security guard testified for the State that he and seven or eight other people were in the line of fire and hit the ground when appellant sprayed bullets in the parking lot of the lounge. He also testified that appellant shot four or five bullets into a house next door in which three children were residing at the time. The State introduced a copy of a record showing that appellant was convicted of armed robbery in 1990. Also during the penalty phase, appellant's mother testified for the defense that she and appellant had received death threats from Wright and West. She testified that appellant was in good mental health and was gainfully employed and that she believed he did not commit the murders.
Bell v. State, 699 So.2d 674, 675-76 (Fla. 1997). Following the jury's unanimous recommendation to impose the death sentence for both convictions, the trial court sentenced Bell to death for each conviction, finding three aggravating circumstances[1] and one statutory mitigating circumstance.[2] *54 State v. Bell, No. 94-9776 CF (Fla. 4th Cir. Ct. order filed June 2, 1995).
Bell appealed to this Court, raising four issues.[3] This Court rejected each of Bell's claims and affirmed the convictions and sentences. Bell, 699 So.2d at 679. The United States Supreme Court thereafter denied Bell's petition for a writ of certiorari. Bell v. Florida, 522 U.S. 1123, 118 S.Ct. 1067, 140 L.Ed.2d 127 (1998).
Bell filed a motion for postconviction relief, which the circuit court summarily denied. State v. Bell, No. 94-9776 CF (Fla. 4th Cir. Ct. order filed Jan. 13, 2000). Following oral argument, we reversed the summary denial and remanded the case to the circuit court for the purpose of conducting an evidentiary hearing. Bell v. State, 790 So.2d 1101 (Fla.2001).
On October 3, 2001, the circuit court granted Bell's motion to represent himself at his postconviction proceedings. The circuit court also appointed Jeanine Sasser to serve as stand-by counsel. Bell then filed an amended pro se motion for postconviction relief, raising twenty-nine claims. The circuit court held evidentiary hearings on fourteen of the claims raised in this motion on April 8-10, 2002. Bell called a number of witnesses to testify in support of his claims, including various witnesses who had testified at trial, character witnesses, and his trial counsel, Richard Nichols.
The circuit court denied each of Bell's postconviction claims. State v. Bell, No. 94-9776-CF (Fla. 4th Cir. Ct. order filed May 31, 2002) (Postconviction Order). Bell appeals the circuit court's denial of his postconviction motion through appellate counsel to this Court,[4] raising twenty-four issues.[5] Bell also petitions this Court for a writ of habeas corpus, raising eight issues.[6]

*55 II. ANALYSIS OF POSTCONVICTION CLAIMS
Bell argues that the circuit court erred in denying his claims in his postconviction motion. Finding no error in the circuit court's conclusion that several of Bell's claims are procedurally barred, we affirm the circuit court's denial of those claims.[7]
*56 The remainder of Bell's claims assert that trial counsel was ineffective. To establish a claim of ineffective assistance of counsel, a defendant must first show that counsel's performance was deficient. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). An attorney's performance is deficient when it falls below an objective standard of reasonableness under prevailing professional norms. Id. at 688, 104 S.Ct. 2052. Second, the defendant must show that counsel's deficiency prejudiced the defendant, which occurs when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. 2052. Ineffective assistance of counsel claims are mixed questions of law and fact. We review the legal issues under a de novo standard of review. The circuit court's factual determinations are given deference if they are supported by competent, substantial evidence. We affirm the circuit court's denial on the merits of Bell's ineffective assistance of counsel claims as set forth below.

A. Failure to Object to Comments Regarding Dale George's Plea
Bell first alleges that his trial counsel was ineffective for failing to object to the introduction of statements that Dale George, who admitted to driving Bell's car on the night of the murders, pled guilty to a charge of accessory after the fact for his participation in this crime.
At Bell's trial, the prosecutor stated in his opening argument that Dale George pled guilty to the charge of accessory after the fact for the instant crime and that he negotiated an agreement with the State that in exchange for his testimony, he would receive a prison sentence of no more than five years. At the start of George's testimony, he admitted that he pled guilty to this charge and detailed the terms of his agreement. The prosecutor reiterated these facts in his closing argument. Bell argues that his trial counsel should have objected to any statements about George pleading guilty to participating in the crime because such statements implied that Bell was also guilty.
The circuit court denied this claim, finding that the prosecutor's comments about George's plea were "legitimate comments on the evidence anticipated and presented at trial, and were not improper." Postconviction Order at 3.
In support of his argument to the circuit court and to this Court on appeal, Bell cites to several cases in support of his claim that trial counsel should have objected to the prosecutor's statements concerning George's plea. However, in each of the cases cited by Bell, the accomplice whose plea was referenced had not testified at trial. See Bruton v. United States, 391 U.S. 123, 137, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (codefendant's confession inadmissible against defendant because since codefendant did not testify, right to confrontation was violated); Parker v. State, 458 So.2d 750, 753 (Fla.1984); Thomas v. State, 202 So.2d 883, 884 (Fla. 3d DCA 1967); Moore v. State, 186 So.2d 56 (Fla. 3d DCA 1966).
Evidence that a witness has received a lighter sentence in exchange for his or her testimony goes to the bias of the witness and is therefore a proper subject for impeachment. § 90.608, Fla. Stat. (1995). The State addressed these matters in an effort to fully disclose the terms *57 of the plea agreement, in anticipation of trial counsel's cross-examination of George. We have held that there is no violation of the Florida Evidence Code when a party attempts to "mitigate the impact of inconsistent statements likely to be introduced, nor anything intrinsic to the jury's truth-finding function in an arbitrary requirement that opposing counsel's trial strategy may not be undercut." Bell v. State, 491 So.2d 537, 538 (Fla.1986). The State clearly could anticipate that competent trial counsel would introduce the details of any plea agreement exchanged for a witness testifying against the defendant. Thus, we affirm the circuit court's finding that Bell failed to demonstrate that trial counsel was ineffective for failing to object to these legitimate comments on the evidence presented at trial.

B. Improper Questioning of Penalty-Phase Defense Witness
In this claim, Bell asserts that trial counsel was ineffective because trial counsel inquired of Margo Bell, the defendant's mother and the sole witness presented by the defense at the penalty phase, whether she was aware that Bell "had gone to prison for a period of time because of a robbery." When questioned about this at the evidentiary hearing, trial counsel Richard Nichols explained that the prosecutor "could have gone into that subject matter anyway" and that he "was trying to minimize the impact of his questioning by bringing the subject up initially" as a "tactical decision." The circuit court found this explanation credible and denied Bell's claim, finding that this questioning was a tactical decision made "with the best interests of Defendant in mind." Postconviction Order at 4-5.
In support of his argument that this questioning was improper and necessitates a new sentencing hearing, Bell cites to this Court's decision in Geralds v. State, 601 So.2d 1157 (Fla.1992). There, we held that the prosecutor's cross-examination of a mitigation witness at the penalty phase constituted reversible error when he inquired whether the witness knew about the defendant's eight prior felony convictions. Id. at 1161. We held that the door had not been opened to permit the introduction of this evidence during direct examination and that it was impermissible for the State to present this inadmissible evidence of the defendant's prior nonviolent felony convictions. Id. at 1162.
However, Geralds is distinguishable because in the instant case, the prior armed robbery judgment and conviction had already been introduced to the penalty-phase jury by the State as an aggravating factor. Moreover, to the extent that Bell asserts that the State used this questioning as an opportunity to get more details introduced about his prior conviction and sentence, the trial court sustained counsel's objections to the State's attempt to introduce these additional details. Thus, even if Bell could demonstrate the first prong of the Strickland test, he could not demonstrate that the questioning of his mother in any way prejudiced his sentencing. Information regarding his prior conviction was already before the jury. Therefore, we affirm the circuit court's determination that no prejudice has been demonstrated.

C. Advising Bell Not to Testify
In this claim, Bell asserts that trial counsel was ineffective for advising Bell not to testify. Before the defense rested at trial without presenting any evidence, Nichols indicated to the trial court that the defendant did not wish to testify. Bell stated on the record, after the trial court instructed him on his rights, that it was his decision not to testify. Bell now essentially argues that it was Nichols' incorrect *58 advice that he could be questioned regarding his prior convictions that led him to refuse to testify.
At the evidentiary hearing, when asked by Bell about his advice regarding the defendant testifying at his trial, Nichols stated:
I told you that if you took the stand you would be subject to cross examination. That one of the items of cross examination would be the number of your prior felony convictions, that if youif the State asked you if you had been convicted of felonies and you answered yes, that they could ask you how many times. If you answered truthfully how many times that would be the end of that, that particular inquiry, but that if you did not answer truthfully that the State could then cross examine you about the specific convictions. And I never told you that they would have the absolute right to talkto question you about specific convictions unless you were untruthful about the number of convictions.
On cross-examination at the hearing, Nichols explained that he felt that it is not good strategy for a defendant to testify at trial if the defendant would be a weak witness and would not add anything beneficial to the defense. He stated that he thought the jury would react "very poorly" to "Bell's general demeanor and style of communication."
The circuit court denied this claim, finding first that Bell failed to show any evidence of what his testimony would have been had he taken the stand at trial, because he did not testify at the hearing. Postconviction Order at 5. Furthermore, the circuit court noted that Bell stated at trial that it was his decision not to testify and that Bell was bound by that representation. Finally, the circuit court set forth that it found Nichols' explanation for his advice not to testify more credible than Bell's allegations.
We affirm the circuit court's denial of this claim. We find no error in the trial court's finding that Bell failed to demonstrate that his counsel was deficient. In the trial record, Bell clearly and voluntarily waived his right to testify. In response to the trial court's inquiry, Nichols indicated that he had fully informed Bell of the consequences of testifying at trial. Bell told the trial court that it was his decision not to testify. Thus, competent, substantial evidence supports the trial court's determination that the defendant knowingly and voluntarily elected not to testify. See Lott v. State, 931 So.2d 807, 818 (Fla.2006) (while trial court does not have to make on-the-record inquiry regarding defendant's waiver of right to testify, there must be support in record that waiver was knowingly, voluntarily, and intelligently made).
Moreover, counsel testified that his advice to Bell was made for strategic reasons. We have noted that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000). Because we agree that Nichols' decision was reasonable, we affirm the circuit court's denial of this claim. See Shere v. State, 742 So.2d 215, 222 (Fla.1999) (affirming a circuit court's determination that counsel's advice to Shere not to testify was a reasonable, tactical decision due to Shere making inconsistent statements and being a difficult client).
To the extent that Bell asserts that his trial counsel incorrectly advised him of what evidence the State would introduce *59 regarding his prior convictions, the only evidence presented as to what Nichols told Bell is Nichols' testimony at the hearing. Nichols' statement is an accurate statement of evidentiary law. This case is in contrast to the case cited by Bell, Jennings v. State, 685 So.2d 879, 880 (Fla. 2d DCA 1996). There, the Second District Court of Appeal reversed for an evidentiary hearing the summary denial of Jennings' claim that trial counsel advised the defendant that if he elected to testify, the violent details of his criminal history would be brought forth before the jury and guarantee conviction. The circuit court here has held an evidentiary hearing and found Nichols credible. In evaluating the circuit court's order, "this Court will not substitute its judgment for that of the trial court on . . . the credibility of the witnesses and the weight to be given to the evidence," provided its order is supported by competent, substantial evidence. Porter v. State, 788 So.2d 917, 923 (Fla.2001). Bell fails to show that the circuit court's determination was not supported by competent, substantial evidence, and we affirm its assessment that trial counsel was not deficient.
In addition, Bell failed to demonstrate any prejudice resulting from the absence of his testimony at trial. Bell did not testify at the evidentiary hearing, so besides the bare allegations of his motion and brief, there is no evidence to establish what else he would have revealed about the facts of this case had he testified. Any assertion that his testimony would have provided evidence to support a self-defense claim is without support in the record before this Court. Therefore, because Bell fails to satisfy either prong of Strickland, we affirm the denial of this claim.

D. Improper Prosecutorial Comments
Bell next asserts that his trial counsel was ineffective for failing to object to various comments made by the State in its closing arguments at both the guilt and penalty phases of the trial. At the guilt-phase closing arguments, these comments included three separate remarks that Bell lived "by the law of the jungle." The prosecutor also stated: "I submit to you that the blood, the blood of Tamecka Smith and the blood of Jimmy West that that defendant spilled in the parking lot, that cold pavement of that Moncrief Liquors parking lot, their blood cries out for justice."
Bell also cites comments during the penalty-phase closing argument that he claims were reversible error to which counsel should have objected. These comments included that the State had screened the case to determine whether it was worthy of the death penalty; that the jury should show the defendant the same mercy he had shown the victims; that laws could change such that the defendant could serve less than twenty-five years in prison if the jury did not recommend a death sentence; and that the jury must recommend a death sentence. We have previously held many comments similar to these to be error. See Brooks v. State, 762 So.2d 879 (Fla.2000); Urbin v. State, 714 So.2d 411 (Fla.1998); Rhodes v. State, 547 So.2d 1201 (Fla.1989); Pait v. State, 112 So.2d 380 (Fla.1959).
At the evidentiary hearing, Bell asked Nichols whether he thought these various comments were improper, and Nichols responded:
No. And even if it were something that appellate courts saiddescribed as being improper, not every improper argument is something that [a] defense lawyer wants to object to because sometimes when a prosecutor makes what would otherwise be considered an improper comment, it essentially opens the door for the defense to attack that strategy in rebuttal. And I have many times *60 let prosecutors, without objection, say things that I thought were objectionable but did it so that I could make a comment on it when I got my next chance to speak.
On cross-examination by the State, Nichols further explained:
You have to sort of gauge the pace of the trial and make a decision whether these comments that taken out of context sound like damaging comments and make a decision whether they truly are in the flow of things either significant or damaging.
And you have to guard your own credibility with the jury with regard to just hopping up and down out of your chair and making objections when things are happening that the jury really doesn't see as having very much meaning.
And sometimes impropersometimes comments that might genuinely be labeled as missas improper are once [sic] that open the door for me to make a response that I want to have an opportunity to make and so I'll allow the comment to go forward.
The circuit court denied Bell's claims, first finding that they were procedurally barred because they could and should have been raised on direct appeal. Postconviction Order at 8. The court also denied the ineffective assistance of counsel claims on their merits, finding that defense counsel gave a legitimate, reasonable strategy for his decisions not to object and that it was improper to view those reasons in hindsight. Id. at 27. The court finally concluded that Bell failed to demonstrate any prejudice as a result of these remarks.
To the extent that Bell's claim asserts that the prosecutor's comments were error, this claim should have been raised on direct appeal and is procedurally barred as a postconviction claim. See, e.g., Lamarca v. State, 931 So.2d 838, 851 n. 8 (Fla.2006) (claims of prosecutorial misconduct were procedurally barred because they could have been raised on direct appeal).
However, Bell's claim that trial counsel was ineffective for failing to object to these remarks is properly raised on postconviction appeal. Bell cites to this Court's decision in Brooks as evidence that these comments were improper. In that case, we reversed Brooks's death sentence on direct appeal on the basis that the prosecutor (the same prosecutor who tried the instant case) made a variety of improper statements, some of which were objected to and some of which were not, in his penalty phase closing statements. Brooks, 762 So.2d at 898. After our review of the entire closing argument and in consideration of the jury's close seven-to-five death recommendation, "we determine[d] that the objected-to comments, when viewed in conjunction with the unobjected-to comments, deprived Brooks of a fair penalty phase hearing." Id. at 899.
We agree with Bell that many of the comments that were the basis for our reversal of the penalty phase in Brooks are similar to those that are the basis for Bell's arguments in the instant case. We also note that similar comments were made by the same prosecutor and similarly reversed in Urbin.
Nichols also served as defense counsel at the trial in Brooks. He explained at the evidentiary hearing in the instant case that he objected to some similar comments in Brooks's trial but not in the present case because "whether or not I thought it was proper to object to it would depend on the total environment that we were in at the case at the time that that was made."
For purposes of our review, a material difference between this case and *61 Brooks and Urbin is that Bell's claims are here for our review on postconviction appeal and raised as ineffective assistance of counsel claims, while in Brooks and Urbin we reviewed the comments as substantive error on direct appeal. In a direct appeal review, there is no prejudice prong consideration like there is in consideration of a claim of ineffective assistance of counsel in a postconviction claim under Strickland.
We find no error in the circuit court denying relief on this claim based upon our determination that Bell failed to demonstrate the necessary prejudice to satisfy the second prong of the Strickland test. We agree that even assuming Nichols was deficient in not objecting to the prosecutor's closing argument, Bell has not demonstrated prejudice in either the guilt or the penalty phase of the trial. Our confidence in the outcome has not been undermined.
Conclusive evidence of Bell's guilt was presented at trial, including the testimony of several eyewitness who testified that Bell planned, carried out, and confessed to these murders. At the penalty phase, the State proved three strong aggravating factors beyond a reasonable doubt (prior violent felony, created great risk of death to many, and CCP). Only one statutory mitigating factor was found to be established and weighed against these aggravators. The jury recommendation of a death sentence was unanimous. Cf. Brooks, 762 So.2d at 899 ("[C]onsidering the jury's close seven-to-five recommendation that Brooks be sentenced to death, we determine that the objected-to comments, when viewed in conjunction with the unobjected-to comments, deprived Brooks of a fair penalty phase hearing."). We deny Bell's claim.

E. Ericka Williams' Recorded Statement
Bell claims that trial counsel was ineffective because he failed to discover a tape which would have demonstrated that a key State witness's testimony was false. Ericka Williams was Bell's girlfriend at the time of these murders. She testified against Bell at trial about statements he made before the crime indicating his intention to kill Theodore Wright; that she purchased for Bell the AK-47 that was used to kill the victims; and that immediately after the murders, Bell confessed to her that he had evened the score against Wright. Bell asserts that before trial, he told Nichols that a tape existed in which Williams confessed that her statements and testimony were coerced by Detective William Bolena of the Duval County Sheriff's Office, the lead investigator in this case, and that she actually gave the AK-47 to Dale George before the victims were killed. Supposedly Rod Gregory, an attorney, had possession of this tape.
At the postconviction evidentiary hearing, Williams maintained that her trial testimony was the truth. She remembered having a conversation with Rod Gregory at the insistence of Bell but could not recall the substance of that conversation. While investigator Don Marks was not asked specifically about this tape, he testified at the evidentiary hearing that he investigated every issue Bell asked him to and that he found nothing favorable to the defense. Nichols testified that it was his understanding that the tape was investigated by Marks but was never produced. Although the tape was not mentioned in Marks's report, his notes were submitted at the hearing as a defense exhibit and reflected that on January 12, 1995, he attempted to call Rodney Gregory, but Gregory was out of town and never returned Marks's call. The circuit court denied this claim, finding that Bell failed to present any evidence to substantiate his assertions. Postconviction Order at 11.
*62 Trial counsel has a duty to investigate any potential impeaching or exculpatory evidence that may assist his or her client. See Rompilla v. Beard, 545 U.S. 374, 383, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) ("[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."). However, we agree with the circuit court that Bell has failed to demonstrate that the evidence he claims would have impeached Williams' testimony ever existed. Rod Gregory did not testify at the evidentiary hearing, and Williams maintained that she was not coerced into giving her trial testimony. While she remembered speaking to Gregory, she could not recall the substance of their conversation. Because Bell has failed to demonstrate that a tape existed which counsel could have discovered, we agree that he has failed to demonstrate that Nichols was deficient. We affirm the circuit court's denial of this claim.

F. Failure to Present the Testimony of Andre Mayes
In this issue, Bell argues that the circuit court erred in concluding that his claim of ineffective assistance based on the failure to call an impeachment witness was "wholly" not demonstrated at the hearing. This claim relates to the testimony of Charles Jones, a key State witness at Bell's trial. Jones testified at trial that Bell attempted to sell him and several other people an AK-47 a few weeks before Christmas in 1993, just after the murders of West and Smith. He stated that Bell "was just really anxious, trying to sell it and nobody still wouldn't buy it, then he drop the price down to 300 and nobody still didn't buy it." Jones also testified that he later had an encounter with Bell in which he asked Bell why he killed Jimmy West and not Theodore Wright, and that Bell stated, "He killed my brother, and that was the closest thing to me and I kill his." When Jones asked about why he killed the girl in the car, Bell allegedly responded, "Bullets don't know nobody." On cross-examination, Jones admitted that he did not like Bell and that they had quarreled in the past.
At the evidentiary hearing, Andre Mayes testified that he shared a cell with Jones in 1994 at the Duval County Jail. According to Mayes, Jones would leave for interrogations and would return having received benefits. Mayes stated that Jones told him, "The case that I got something to do with, the detective on [it] called me over and while I'm over there my family . . . members come to see me." Mayes testified that he assumed from certain events that Jones was fed while in the other building. Mayes also stated that Jones told him about a confrontation he had with Bell. On cross-examination, Mayes admitted that Jones never stated that he was forced to testify against Bell. He stated that Jones did say that he was going to make sure Bell went to prison, but Jones never stated that he was going to lie in his testimony.
Jones also testified at the evidentiary hearing and stated that he received no special visits or treatment in exchange for his testimony and that his testimony at Bell's trial was the truth. Jones stated that he knew Mayes but that they never discussed Bell or Bell's case. Jones thought that Mayes carried a grudge against him because Jones had refused to testify on Mayes' behalf at Mayes' trial. Jones's wife also testified at the evidentiary hearing that she never made any special visits with him while he was in prison and that she only visited her husband in the regular visitor area.
*63 The circuit court denied this claim, finding that the testimony of the Joneses was more persuasive and credible than the testimony of Mayes. Postconviction Order at 13. The court also found that the evidence presented by Bell "wholly failed" to support his assertions. Id.
Questions of credibility are left to the determination of the circuit court, and provided there is competent, substantial evidence to support those credibility assessments, we will defer to that court's decision. Archer v. State, 934 So.2d 1187, 1196 (Fla.2006) ("This Court is highly deferential to a trial court's judgment on the issue of credibility."). Given that Jones's wife's testimony at the hearing supported his own, that Jones testified about a grudge that Mayes held against him, and that Jones's testimony remained consistent with that which he gave at trial, competent, substantial evidence supports the circuit court's determination that Jones was a more credible witness than Mayes. Thus, Bell failed to demonstrate that Jones received special treatment in exchange for his testimony. Moreover, Bell was never able to demonstrate that Jones's testimony at trial was false as a result of the alleged special treatment. Bell cannot demonstrate that trial counsel was deficient for failing to present noncredible testimony at Bell's trial. Therefore, we affirm the circuit court's denial of this claim.
Bell also asserts that Mayes's testimony would have provided support for the feud between Bell and Jones, thus further discrediting Jones's testimony at trial. However, Jones explicitly testified at Bell's trial on cross-examination that he did not like Bell and that they had quarreled in the past. Therefore, this testimony would have been cumulative to evidence already presented at trial.

G. Failure to Investigate and Present a Credible Defense
In his next claim, Bell argues that trial counsel was ineffective for failing to fully investigate and present a credible defense. At trial, the defense rested without presenting any evidence or witnesses. The trial judge gave the jury an instruction on self-defense.
At the evidentiary hearing, Nichols testified regarding his strategy for defending Bell, stating that his hands were tied by Bell's actions:
In your case, my recollection was that the State's case was essentially overwhelming, and that in attempting to prepare with you, you would not tell me any information that I could use with regard to a defense. That your strategy, as I understood it, and I think the words that you used over and over again was that they were going to have to bring it to you in the courtroom.
My analysis of that was that you didn't believe the State's witnesses would actually show up to court. And when they did, I think you were surprised by it and there was no defense except to try to essentially hold the State's feet to the fire, to test or at least to attack deficiencies in their case.
There were no affirmative defenses, although I think there had been a request for instruction of self-defense.
There were no alibi defenses, and the strategy of trial was strategy of trying to expose any defects or deficiencies, inadequacies in the State's case. And unfortunately there just weren't any.
When asked about why he asked for a self-defense instruction when no evidence of self-defense had been given, Nichols responded:
Your [Bell's] position had been apparently, as I recall, up until just about the *64 time for the charge conference on the jury instructions, that you had not committed this crime. But then as we were getting ready for the charge conference you indicated in a vague sort of way that well, maybe what you had done was shot in self-defense because you thought this victim had gone for a gun because you knew him to carry a gun.
. . . .
It was the first time I had ever heard anything like that because up until that time you had denied you committed the crime so we brought that 
. . . .
You [Bell] brought that theoretical possibility to the attention of the Court and the Court, I think, in just abundance of caution said, okay, I'll give you the self-defense instruction, even though there was really no self-defense theory in the case.
The only defense . . . from what you had told me that was available was to attempt to attack the credibility of the State's witnesses and we did that as carefully as we could. There was no other defense.
Following the evidentiary hearing, the circuit court denied this claim, finding that the information provided by Bell did not permit Nichols to proceed on a theory of self-defense. Postconviction Order at 14-15. The court stated that "[c]ounsel proceeded to trial and planned a defense strategy based upon Defendant's representations to him concerning the crime and his lack of involvement." Id. at 15.
Since no other evidence was presented and Nichols' testimony was supported by competent, substantial evidence, we treat his testimony as an accurate statement of the interaction between Nichols and Bell at trial. Nichols' testimony indicated that he had no defense or evidence available to him beyond what he argued at trial. We therefore find no error in the circuit court's determination that Nichols was not deficient for failing to present a successful defense when no other defense has been demonstrated to have been available.
Moreover, Bell has failed to carry his burden of demonstrating prejudice. At the hearing, Bell presented no witness who could testify that West had a gun, reached for a gun, or in any way committed an overt act that would have caused Bell to react in self-defense. See Holland v. State, 916 So.2d 750, 760 (Fla.2005) (holding that to introduce negative evidence of victim's character, defendant must show that an overt act of the victim at or about the time of the incident reasonably indicated a need for self-defense), cert. denied, 547 U.S. 1078, 126 S.Ct. 1790, 164 L.Ed.2d 531 (2006). Also, Bell has not presented any evidence to support any other claims of innocence. Therefore, we deny his claim that trial counsel was ineffective.

H. Improper Closing Arguments
In this claim, Bell asserts that trial counsel rendered ineffective assistance due to his improper closing arguments at the guilt and penalty phases of trial. The relevant argument during the guilt phase was as follows:
May it please the court, Mr. Bateh, ladies and gentlemen, there are neighborhoods in our community, some within a mile or two of this courthouse which are no safer than the jungle. Little safer than the front lines of some war zone. In order to understand at any level the events of December 9th, 1993, it is necessary for us to descend into that world. This is the world in which Michael Bell and his brother were born and lived and Michael Bell's brother died. And it's the world in which Theodore Wright and Jimmy West live, and Dale George and the others you heard *65 testify. It is a world that is so alienate [sic] to most of our experience that although it's only a mile or two away it might as well be on another planet.
. . . .
. . . But in truth and fact how can any of us who live in such a different world than Jimmy West and Theodore Wright and Michael Bell consider ourselves their peers? It is easy for us to sit here in this guarded, safe, quiet, protected environment and chairs elevated off of the floor and in the sense of kind righteous indignation want to strike out in revenge and condemn people who live in a world different than ours. And certainly regardless of what neighborhood or community or type of social structure someone lives in, there are certain acts and events that we can never condone, but we must make some attempt in honoring our oath as jurors and our duty as jurors of  as peers to understand and make some sense of these things.
In remarking on the incident in which Bell's brother was shot, Nichols commented on Theodore Wright's behavior that night:
Almost like a scene out of some Wild West sort of sleuth [sic] out, he borrows a gun, strolls out into the road and they have a shoot out. That's the kind of environment these people were living in.
At the evidentiary hearing, Nichols explained his remarks and stated that he did not think the facts of this case matched up to a traditional self-defense argument. As set forth in the analysis of the previous issue, Bell first indicated to Nichols that he could pursue a self-defense claim prior to the jury charge conference. Thus, closing argument marked the first time Nichols could argue self-defense. Nichols stated at the evidentiary hearing that he hoped to convince the jury that if they could understand the environment in which Bell lived and his feelings about Wright and West, they could possibly accept a self-defense argument. The circuit court denied Bell's claim, finding that this argument was the product of a reasonable tactical decision. Postconviction Order at 17.
We find that the circuit court's determination that this was a reasonable tactical decision is supported by competent, substantial evidence. Nichols was arguing in accordance with this stated goal at the time of his guilt-phase closing argument, as evidenced by the following statement:
And it's important for you to keep that in mind because the Judge is going to read you an instruction on self-defense. And self-defense is a little more pervasive than what we might think of at first blush because it takes into account if we know that there are people out there trying to kill us, and we reasonably do things to try to protect ourselves from that or even in a situation of confrontation. And the Judge will explain that to you and it's a fairly long instruction and I invite you to listen to it carefully, but part of it assumes and you must understand that whole environment in which these acts took place.
This trial record supports counsel's claim that the remarks regarding Bell's neighborhood were to support his self-defense argument to the jury. Moreover, given the State's closing arguments describing Bell as living by the "law of the jungle," it is not unreasonable in this context for trial counsel to have made the comments he made. Because there is evidence to support the determination that trial counsel's strategy was reasonable, we find that the circuit court properly denied Bell's claim of ineffectiveness.
Bell also argues that counsel was ineffective in his penalty-phase closing argument.[8] *66 The remainder of Bell's claims regarding penalty-phase closing arguments are similar to his objections to the argument made about the guilt-phase arguments. Nichols again differentiated between the environment in which the jury lived and the environment in which Bell and the victims lived. Nichols also referred to the events of that night as a "tragedy." The majority of Nichols' argument in closing at the penalty phase appears to be in answer to the State's closing arguments asking that Bell be given the same mercy that he had given to the victims. Essentially, Nichols argued that the jury was not in the same situation or raised in the same community as Bell and should reject the prosecutor's same-mercy argument. While this ultimately was not a persuasive or successful argument, it is important not to view defense counsel's actions with the benefit of hindsight or the knowledge that the argument was ultimately unsuccessful. Strickland, 466 U.S. at 689, 104 S.Ct. 2052. Since the focus of the penalty phase was on demonstrating the fear that Bell was in when he approached West, this closing argument comported with the evidence presented.
Moreover, Bell has failed to demonstrate that he was prejudiced by Nichols' performance. In the guilt phase, there were numerous eyewitnesses who testified that Bell planned, carried out, and admitted to having committed these murders. At the penalty phase, the State presented three strong aggravating factors, and there was little evidence presented in mitigation. Because our confidence in the outcome of Bell's trial is not undermined, we affirm the circuit court's denial of this claim.

I. Shackling of Bell Before Jury
Bell asserts that his trial counsel was ineffective because counsel failed to object to the jury viewing Bell in shackles. Shackling a defendant before the jury is considered an "`inherently prejudicial practice' [that] must not be done absent some showing of necessity." Bello v. State, 547 So.2d 914, 918 (Fla.1989) (quoting Holbrook v. Flynn, 475 U.S. 560, 568, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986)).
At the evidentiary hearing, Bell repeatedly inquired of many trial witnesses whether they recalled seeing him shackled. All responded negatively,[9] except his mother, Margo Bell. When asked on cross-examination at what point she saw him chained, however, she responded: "I can't say, really, to tell you the truth. I know he was in chain cause I was at every hearing, everything, every day. I can't say what day, time, you know, when or what cause it's been many years ago, but I remember the chains because I cried looking at him. . . ." Dale George also thought that Bell had his feet chained, but he was uncertain because the trial had happened a long time ago. Nichols stated that it was his recollection that Bell was never shackled in front of the jury. He continued:
And frankly, if somehow a jury had inadvertently seen you shackled, I would have thought it would do more harm to your case than good to explain to them why it was you were being shackled. I think and from the defense's standpoint I would not want them to have seen it. But had they seen it, I'd hate for them to know everything that I knew or the government knew or the law enforcement knew that caused them to think that was a necessary precaution.
*67 The circuit court denied Bell's claim, finding that there was no evidence to support the assertion that Bell was shackled during the trial, and that even if he had been, he failed to demonstrate that the jury was aware of this shackling. Postconviction Order at 18.
Competent, substantial evidence supports the circuit court's determination that Bell was not shackled at trial. The only testimony that Bell was shackled was that of his mother and Dale George, both of whom were unable to pinpoint at what phase of trial they observed Bell shackled. Bell points to no evidence from the trial record that he was shackled in front of the jury. Thus, we affirm the circuit court's determination that Bell has failed to demonstrate that trial counsel was deficient because he has failed to demonstrate that he was ever shackled in the presence of the jury. See Sireci v. Moore, 825 So.2d 882, 888 (Fla.2002) (because there was nothing in the record to lead the Court to conclude that the jury ever saw defendant in restraints, appellate counsel was not ineffective for failing to raise the issue on direct appeal).

J. Improper Competency Reports
Bell claims that trial counsel was ineffective because he should have ensured that the competency reports complied with the rules of criminal procedure. Florida Rule of Criminal Procedure 3.211(a)(2) provides:
In considering the issue of competence to proceed, the examining experts shall consider and include in their report:
(A) the defendant's capacity to:
(i) appreciate the charges or allegations against the defendant;
(ii) appreciate the range and nature of possible penalties, if applicable, that may be imposed in the proceedings against the defendant;
(iii) understand the adversary nature of the legal process;
(iv) disclose to counsel facts pertinent to the proceedings at issue;
(v) manifest appropriate courtroom behavior;
(vi) testify relevantly; and
(B) any other factors deemed relevant by the experts.
Bell asserts that because the competency report did not specifically set out each of these elements, it was in violation of the rule and that trial counsel should have objected to it or demanded that an assessment in accordance with the rule's provisions be provided in the report.
The competency report, a letter to the trial judge dated December 30, 1994, set out Bell's statement of the basis for the trial, including his assertion that he is not guilty. The report stated that Bell "reason[s] concretely" and "understand[s] that he is involved in an adversary process." The report stated that the experts' clinical impressions were that Bell suffered from adjustment disorder with depressed and anxious mood but that ultimately Bell was competent to proceed at trial.
Bell called Dr. Ernest Miller at the evidentiary hearing. Dr. Miller examined him prior to trial and prepared the letter on his competency. When asked why the report did not set out each item required by rule 3.211, Dr. Miller responded:
The report . . . when necessary can . . . be clarified and each of these questions as you are properly addressing to me can be responded to in the manner of what's obtained as a result of the examination. All of these . . . questions which were invented, if you will, or developed by Paul McGary at Harvard and subsequently became part of the process of the law in Florida, are simply things *68 which must come forth as a result of the psychiatric examination. It does not mean you have to nor even should address the patient with a specific question. . . .
Dr. Miller also testified that he did not think any additional information was necessary for his determination as to Bell's competency. The circuit court denied Bell's claim. Postconviction Order at 21.
The evidentiary hearing transcript demonstrates that Dr. Miller considered each factor. Therefore, the evidence supports the circuit court's determination that Bell failed to demonstrate that counsel was deficient in his handling of the competency report. Moreover, there was no indication that Bell was prejudiced by counsel's action because it is not now alleged that Bell was incompetent or that a more complete report would have changed the outcome of the trial.

K. Concession of Guilt and CCP Aggravator
Bell asserts that his trial counsel conceded Bell's guilt and the CCP aggravator in counsel's closing remarks at the guilt and penalty phases of trial. The relevant comment from the guilt phase that is cited as error was the following:
And it seems to me that oft[en] juries and certainly you are in a situation where you see senseless jungle like barbaric killing but you're confronted with the situation where the witnesses for the state tell a number of different stories.
While Nichols commented on the ferocity of the killings, he did not concede that Bell committed those killings. Nichols was instead explaining that the fierceness of the killings did not mean that the jury should convict Bell if the evidence did not prove that Bell was guilty. Thus, we affirm the circuit court's determination that Bell did not demonstrate that trial counsel was ineffective because of that remark.
Bell also asserts that trial counsel made several remarks conceding the CCP aggravator during his penalty-phase closing argument. These comments included:
The cold, deliberate, calculate[d], intentional killing of a human being is an unacceptable act. It should be utterly and completely unacceptable in a civilized society. It is just as unacceptable, it is just as much a tragic act of violence when it's done by  whether it's done by a masked gunman in a parking lot or whether it's done by a hooded anonymous executioner at the Florida State Prison. It's unacceptable and it's tragic.
. . . .
. . . But if you look at this, you'll see that although there is no justification, moral or legal for the acts that were committed at Moncrief Liquors, that neither is this the kind of case that requires a death penalty as asked for by the State.
Bell has failed to demonstrate that Nichols conceded the CCP aggravator with these comments. In each instance, trial counsel is responding to the State's same-mercy argument by explaining that the jury should not commit similar offenses to those committed in this case. While this argument was not successful, Bell has not demonstrated that this closing argument was outside the wide range of acceptable performance by trial counsel. See Windom v. State, 886 So.2d 915, 929 (Fla.2004) ("[I]t was reasonable trial strategy for [trial counsel] to be realistic about the facts of the case in order to restore a measure of credibility to the defense as it moved into the penalty phase." (quoting trial court's order)); Reed v. State, 875 So.2d 415, 434 n. 11 (Fla.2004) ("Clearly, the point of this argument was not to concede the [heinous, atrocious, and cruel] aggravator but rather to acknowledge the brutality of the crime *69 in an attempt to sympathize with the jury's emotional reaction to it, warn them against a misguided desire to convict anyone on the basis of that emotional reaction, and ensure they held the State to its burden of proof in the guilt phase.").
Even if trial counsel was deficient for these remarks, Bell has not demonstrated that any prejudice resulted from counsel's comments because, given the facts of this case, our confidence in the outcome is not undermined specifically as to the finding of the CCP aggravator. Id. ("Furthermore, given the facts of this case, we cannot find that, in the absence of this comment, the HAC aggravator would not have been found by the judge or jury."). Thus, we affirm the circuit court's denial of this claim.

L. Spectator's T-shirt
Bell claims that trial counsel was ineffective for failing to get a conclusive ruling on his motion to strike the entire jury venire due to the presence during voir dire of a spectator in the courtroom who wore a T-shirt memorializing and depicting one of the victims. The discovery and inquiry occurred after the prospective jurors were excused for lunch:
THE COURT: Ask that lady with the picture on her shirt to step back in here. Is this picture, I can't see from here, is that picture of someone on the T-shirt?
MR. NICHOLS: It's a picture of the victim, is it not?
MR. BATEH: I didn't see.
THE COURT: Picture of the victim in this case?
MR. NICHOLS: Yes.
THE COURT: You're not allowed to do that. If you want to watch the trial at 1:15 if you want to come back with another T-shirt on you do that, that would be error. All it will do is cause this case to be reversed if that picture of the victim in this case is worn by anyone. If you want to come back you make sure you come back without it. You may step out in the hallway, please.
MR. NICHOLS: Your Honor, before she leaves I need to look at the T-shirt and see what it says on it and see what I need to raise.
. . . .
MR. NICHOLS: It says  it's got a photograph of one of the victims, Tamecka Smith, and it says  and the photograph fills up nearly the entire front of the T-shirt. Underneath it says  I think it says well remembered in the record in memory of our beloved Tamecka Smith and then birthday and date of her death.
. . . .
MR. NICHOLS: Your Honor, I have noticed this lady being present, although I did not notice what was on the front of the T-shirt. She's been present during the entire process this morning, I don't know how many jurors have seen it. It's a photograph of the top of the shoulders and head of Tamecka Smith. I think out of abundance of caution I should ask the court to strike this panel and get a new [panel].
THE COURT: Well, I don't know how many of them saw it, I don't know many of them saw the picture, I can see the picture from here but I can't read the writing underneath the picture.
. . . .
THE COURT: Well, what we will do since just make inquiry [sic] of the jury when they come back I will frame the question in such a way hopefully get response without any other problems.
When the jury returned, the trial court made the following inquiry:
THE COURT: Members of the jury panel, during the course of the proceedings *70 this morning there were a number of women in the courtroom on the side opposite you sitting toward the rear and one of them had  was wearing a white T-shirt and had a picture on it and another as I understand had a picture and a frame. I don't know how big the picture in the frame was. The question is: And I think the only opportunity you would have had to seen them [sic] is when you got up and turned around to leave the courtroom but did any of you see those persons? If so raise your hand.
All right. We've got seven of you saw those persons with theeither the picture in the frame or the picture on the T-shirt. Did any of you know who the person on the  in the picture was or on the T-shirt was? If so raise your hand. No one has raised their hand.
Would having seen the picture on the T-shirt or the picture in the frame, would that affect your ability to be a fair and impartial juror if you're selected to serve on the jury in this case, would it affect your ability? If so raise your hand.
All right. No one has raised their hand.
Bell claims that the panel should have been stricken and that Nichols was ineffective for not pursuing his motion to strike the panel with the trial court. This claim was not addressed at the evidentiary hearing, and the circuit court neglected to address it in its order. Effectively, the circuit court summarily denied this claim since it ultimately denied Bell relief on his postconviction motion. In reviewing a summary denial of a postconviction claim, we "must accept the defendant's factual allegations as true to the extent they are not rebutted by the record." Mann v. State, 770 So.2d 1158, 1162 (Fla.2000).
The trial record fully rebuts Bell's assertion that trial counsel was ineffective for failing to move to strike the jury following the trial court's examination because the jury was not tainted. Considering a similar claim in a previous case, we denied the defendant's claim that the jury was tainted and should have been excused following a spectator's display of photos of the victim. Buckner v. State, 714 So.2d 384, 389 (Fla. 1998). We stated:
Under certain circumstances, prejudicial exhibition of emotion may deprive a defendant of a fair trial. Woods v. Dugger, 923 F.2d 1454 (11th Cir.1991) (where prejudicial exhibition "extreme," new trial warranted). Moreover, it is inappropriate for a judge to inquire into the emotions, mental processes, or mistaken beliefs of jurors. State v. Hamilton, 574 So.2d 124 (Fla.1991). However, a judge may objectively look to the extrinsic factual matters disclosed to the jury and then determine whether there was a reasonable possibility that the breach was prejudicial to the defendant. Id. at 129. In this case, a few of the jurors saw the photographs for a brief moment only and even then, saw them only from a distance; the photographs consisted of nothing more than the victim pictured with other individuals; and none of the jurors who saw the photographs could identify who was depicted in the photographs. On these facts, there is no reasonable possibility that the jury's brief exposure to the photographs may have changed the outcome of the proceeding. See, e.g., Burns v. State, 609 So.2d 600 (Fla.1992) (widow crying three times in courtroom insufficient to prejudice jury). Consequently, we find this claim to be without merit.
Id. The trial judge in the instant case fully inquired into whether the jury had seen the T-shirt and found that none of the prospective jurors knew who was depicted *71 and none would let the T-shirt influence their decision-making. Thus, there was no reason for the trial court to strike the panel, and trial counsel was not ineffective for failing to pursue a nonmeritorious objection which would have been properly overruled by the trial court. In addition, Bell cannot demonstrate that any prejudice occurred as a result of counsel's actions. Therefore, we affirm the denial of this claim.

M. Comments on Jury's Role in Penalty Phase
Bell claims that trial counsel was ineffective for failing to object to various comments made by the trial judge and the prosecutor that Bell claims violated the Supreme Court's decision in Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). However, we have repeatedly rejected objections to the Florida sentencing scheme based on Caldwell. See Sochor v. State, 619 So.2d 285, 291 (Fla.1993); Turner v. Dugger, 614 So.2d 1075, 1079 (Fla.1992). Therefore, because we have reviewed the comments and determined that they were consistent with Florida's sentencing scheme, we affirm the circuit court's determination that counsel was not ineffective for failing to object to them.

N. Peremptory Strike
Bell asserts that trial counsel was ineffective for failing to object to the State's peremptory striking of a prospective juror. The prospective juror stated during voir dire that following his father's murder, he was less in favor of the death penalty. He stated that he believed that the death penalty "[i]n a sense" had a place in the criminal justice system. The State subsequently used one of its peremptory strikes on this prospective juror.
The circuit court denied Bell's claim, holding that any substantive claim was procedurally barred. The court also found that Bell failed to state a legal basis upon which the trial court could have denied the peremptory challenge; therefore trial counsel was not deficient, nor did any prejudice result from trial counsel's failure to object. Postconviction Order at 29.
The Supreme Court has held that a prospective juror's conscientious objection to the death penalty is not a sufficient basis for a trial court to excuse the juror for cause. Witherspoon v. Illinois, 391 U.S. 510, 522, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). However, we have specifically held that the State may exercise peremptory challenges against jurors who express some opposition to the death penalty. See Morrison v. State, 818 So.2d 432, 444 (Fla. 2002). Indeed, "[b]oth parties have the right to peremptorily strike `persons thought to be inclined against their interests.'" San Martin v. State, 705 So.2d 1337, 1343 (Fla.1997) (quoting Holland v. Illinois, 493 U.S. 474, 480, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990)). Counsel is not deficient for failing to object to a peremptory strike for which there is no legal basis to deny. Therefore, we affirm the circuit court's denial of this claim of ineffective assistance.

O. Failure to Investigate and Prepare for the Trial Testimony of Various State Witnesses
Bell asserts that trial counsel was ineffective for failing to impeach several State witnesses at trial with various information.

1. Mark Richardson
Bell first asserts that trial counsel was ineffective because he should have cross-examined Mark Richardson to bring testimony before the jury that Richardson touched West's body after the shooting. Richardson testified on behalf of the State *72 at Bell's trial that he and the victim, Jimmy West, had been good friends for over ten years prior to the shootings. He was with West at Moncrief Liquors on the night of December 9, 1993. He followed West and his female companions out that night, and watched them get into the car. He testified that he saw a man with a ski mask and a machine gun shoot into the car, and that when Richardson yelled, the man turned around and started shooting at him. He ran over to West's body after the gunman left and remained there until the police arrived. On cross-examination, trial counsel asked Richardson several questions about the details of that night and asked him whether there were any other guns at the scene other than the one carried by the masked shooter. Richardson replied that there were no other guns at the scene.
At the evidentiary hearing, Richardson confirmed that he was the first one to approach West after the shootings. He testified that he actually touched West's body. He stated that he did not give a gun to West's mother or stepfather. He maintained that his trial testimony was the truth. He stated on cross-examination by the State that he did not remove anything from West's body before the police arrived and that he did not touch anything in or remove anything from the car.
The circuit court denied this claim, finding that Bell failed to satisfy his burden to prove that counsel was ineffective. Postconviction Order at 33. We affirm the circuit court's decision. Bell failed to demonstrate that trial counsel missed any critical testimony that should have been brought out at trial because Richardson testified to nearly the exact same facts at the hearing as he had at trial. The testimony that Richardson touched West's body was not further explored by Bell at the hearing to determine whether that event in any way altered the crime scene before the police investigated. Most importantly, Richardson testified at the hearing and at trial that he saw no other guns at the crime scene besides the masked shooter's gun. Therefore, there is no support for Bell's claim that Richardson's testimony that he touched West's body after the shooting somehow would indicate that he took a gun from the body. We therefore affirm the circuit court's denial of this claim.

2. Charles Jones
Bell's argument with respect to Charles Jones relates to a statement that Jones gave to police in 1995, prior to his trial testimony, that the gun Bell tried to sell him was chrome-colored. Jones's testimony at trial was that about a week before Christmas in 1993, immediately after the murders, Bell was desperately trying to sell an AK-47. On cross-examination, trial counsel developed testimony about a quarrel between Jones and Bell. At the evidentiary hearing, Bell asked a variety of questions about Jones's testimony and his motive for testifying but never asked about the color of the AK-47.
The circuit court denied this claim, finding that Bell failed to carry his burden of demonstrating ineffective assistance of counsel. Postconviction Order at 33. We affirm the circuit court's denial. First, there was no reason for counsel to question Jones about his prior statement or the color of the AK-47 that he claims Bell tried to sell because at no point was this subject brought up on direct examination at trial. Second, even if counsel could have raised the discrepancy in the color of the AK-47 that was sold to Williams and the one that Jones claims Bell was trying to sell, Bell cannot demonstrate that he was prejudiced by the failure to present this discrepancy. Our confidence in the outcome of trial is not undermined by this *73 discrepancy. Thus, we affirm the circuit court's denial of this claim.

3. Videotape
Bell asserts that trial counsel should have impeached Dale George and Ericka Williams regarding a videotape that they had both seen prior to their testimony at Bell's trial that showed Bell having sex with George's girlfriend. At the evidentiary hearing, George testified that he had seen the video, that it had angered him, but that he had gotten over his anger and "let it go." He stated that the tape did not cause him to falsify his testimony against Bell. He pointed out that if he had been that angry, he would not have sat in jail for six months prior to giving the testimony he ultimately gave at trial; he simply would have initially blamed the crime on Bell. Ericka Williams testified that the tape also did not motivate her to give false testimony, although she was angry.
Bell presented at the evidentiary hearing the testimony of Marvin Williams, who stated that George had told him that he lied because Bell slept with his girlfriend. However, on cross-examination Williams admitted that George never told him precisely what George had lied about or whether that lie related to the trial at all.
The circuit court denied this claim, finding that Bell failed to carry his burden of demonstrating that counsel was ineffective for failing to impeach the witnesses with this evidence. Postconviction Order at 34. We affirm the circuit court's decision. Bell failed to demonstrate that this tape had any effect on the testimony of Williams or George. Therefore, we agree with the circuit court that Bell has been unable to prove that counsel was deficient or that Bell was prejudiced by counsel's actions.

4. Prior Shooting
Finally, Bell asserts that trial counsel should have questioned George about having witnessed an event where West shot at Bell. However, the evidentiary hearing transcript refutes that George had any personal knowledge of this event because though he testified that he had heard about it, he did not remember ever witnessing such an event. Thus, we affirm the circuit court's determination that Bell failed to demonstrate that this claim had any merit.

P. Failure to Investigate and Present Mitigating Factors
Next, Bell asserts that trial counsel was ineffective for failing to adequately investigate and present evidence that would have mitigated his offenses such that the jury reasonably could have returned a life sentence recommendation. In the context of counsel's failure to investigate and present mitigating evidence, we have held:
As this Court has said, "the obligation to investigate and prepare for the penalty portion of a capital case cannot be overstated." State v. Lewis, 838 So.2d 1102, 1113 (Fla.2002). In determining whether the penalty phase proceedings were reliable, "[t]he failure [of counsel] to investigate and present available mitigating evidence is a relevant concern along with the reasons for not doing so." Asay v. State, 769 So.2d 974, 985 (Fla. 2000) (quoting Rose v. State, 675 So.2d 567, 571 (Fla.1996)) (alterations in original). Thus, when evaluating claims that counsel was ineffective for failing to present mitigating evidence, the defendant must show that counsel's ineffectiveness "deprived the defendant of a reliable penalty phase proceeding." Id. (quoting Rutherford, 727 So.2d at 223).
Orme v. State, 896 So.2d 725, 731 (Fla. 2005).
*74 At the penalty phase in Bell's trial, the State called John Lipsey, a security guard at the lounge, who testified that during the crime, the masked gunman also shot at the lounge building and into a house next door to the lounge. The State then introduced a copy of Bell's judgment and sentence for a prior armed robbery from May 7, 1990. The State rested, and the defense then called Margo Bell, the defendant's mother. Margo Bell testified that she was aware of a feud between her son and Theodore Wright. She testified that as a result of the feud, there were threats on her life that required her to remain in her home. She stated that these threats lasted for a year. She also testified that West and Wright had threatened to kill the defendant and that at one point, they had shot at Bell but had killed someone else by accident. On cross-examination, Margo Bell stated that her son was a good, mature, and responsible person, but was a victim of circumstance. She also stated that he was of good mental health and had never been treated for mental or psychiatric problems.
The defense rested, and Bell responded affirmatively on the record when the trial judge asked whether Bell agreed that the defense would not call any other witnesses and that he would not testify at the penalty phase.
Bell argues that there was substantial mitigation evidence presented at the evidentiary hearing that should have been presented at the trial. The circuit court denied this claim, holding that Bell could not "go behind" his sworn representations at trial. Postconviction Order at 36.
First, regarding the claim based on non-mental health mitigation evidence, Bell presented at the evidentiary hearing testimony by Dale George and Maurice Jones regarding West's prior attempt to shoot Bell. Bell asserts that this evidence would have supported his claim that he feared West. However, it is clear that his mother testified to this information at trial. Thus, Bell's claim based on this testimony was properly denied by the circuit court since it was presented at trial.
Next, Bell asserts that there were several witnesses who testified at the evidentiary hearing about positive aspects of Bell's character. Essentially, each of the witnesses testified that they thought Bell was a nice, helpful, and good person who had made a bad decision. However, Bell's mother also testified to this same information and opinion in her trial testimony. Moreover, while evidence of good character is certainly helpful, this evidence that Bell was considered nice could not have countered the quantity and quality of evidence of aggravating factors presented by the State. Thus, we do not find error in the circuit court's determination that Bell failed to establish the necessary prejudice to be entitled to relief.
Bell also claims that counsel should have presented evidence of mental health mitigation. On this claim, we again find no error in the circuit court's denial of Bell's claim of ineffective assistance of counsel as to the analysis of the prejudice prong of the Strickland test. Bell did not present evidence at the postconviction evidentiary hearing that demonstrated that any mitigating evidence existed that would have outweighed the State's evidence in aggravation. Accordingly, our confidence in the outcome is not undermined.

Q. Oath of Prospective Jurors
Bell asserts that trial counsel was ineffective for failing to ensure that the jury venire was sworn before voir dire began. Florida Rule of Criminal Procedure 3.300(a) requires that all prospective jurors be sworn, either collectively or individually, to answer truthfully all questions asked during voir dire.
*75 At the evidentiary hearing, the State called Mike Riley, assistant to the Clerk of Court for Duval County. Riley testified that in the nine and a half years he had worked at the court, the process each week, without fail, was to give all prospective jurors the oath before dividing them into individual trials. He had no specific recollection of the week Bell's jury venire would have been sworn, but he did not remember any week when this process did not take place. Similarly, Nichols testified at the evidentiary hearing that he did not recall the jurors not being sworn before voir dire.
The circuit court denied this claim. Postconviction Order at 37. We affirm this denial because we agree that Bell failed to prove that the oath was not given. In fact, the testimony given at the evidentiary hearing directly contradicts Bell's assertions, as Riley testified that without fail, the oath was always given to all prospective jurors. Therefore, we affirm the decision of the circuit court.

R. Cumulative Error
Bell argues that the alleged errors by counsel cumulatively resulted in an unfair trial. However, "where individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error must fail." Griffin v. State, 866 So.2d 1, 22 (Fla.2003). Therefore, because we conclude that none of the above claims has merit, we affirm the circuit court's determination that there is no cumulative error.

III. PETITION FOR A WRIT OF HABEAS CORPUS
Bell raises eight claims in his petition for writ of habeas corpus: (1) appellate counsel was ineffective for improperly arguing Bell's claim on direct appeal that Bell should have been permitted to represent himself at trial; (2) appellate counsel was ineffective for failing to raise on direct appeal the erroneous excusal for cause of a prospective juror by the trial court; (3) appellate counsel was ineffective for failing to raise on direct appeal the trial court's error in permitting Bell to wear his jail uniform in front of the jury; (4) appellate counsel had a conflict of interest which rendered his assistance ineffective; (5) appellate counsel was ineffective for failing to raise on direct appeal the issue of erroneous jury instructions; (6) appellate counsel was ineffective for failing to argue on direct appeal that comments made in voir dire were reversible error; (7) Bell's death sentence is unconstitutional under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); and (8) the trial court gave unconstitutional jury instructions.
Bell first asserts that his counsel on direct appeal was ineffective for failing to fully and accurately present Bell's claim that the trial court erred in not permitting Bell to represent himself. When evaluating an ineffective assistance of appellate counsel claim, we must determine:
[F]irst, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986). "The defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based." Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000).
*76 The essence of Bell's claim here is that he unequivocally stated that he wanted to represent himself at trial but that appellate counsel misrepresented this fact to this Court on direct appeal. The issues of Bell's self-representation and motion to discharge counsel were clearly raised on direct appeal. We noted in our opinion that Bell on two occasions complained of the performance of his court-appointed counsel, and each time the trial court held hearings to consider those complaints. Bell, 699 So.2d at 676.
The record supports our determination in our direct appeal decision as to the events at trial. On January 4, 1995, the trial judge read into the record a letter that Bell had sent him asking that new counsel be appointed because of the lack of contact between Bell and Nichols. That letter indicated that Bell wanted someone besides Nichols to represent him. When the trial judge asked him about this, Bell explained that Nichols had not visited him and had failed to help Bell understand the procedural and substantive posture of the case. Bell stated that he wanted to act as co-counsel. As we pointed out in our opinion, Bell essentially wanted either new counsel or to be made co-counsel and never specifically stated to the trial judge that he wanted to represent himself.
The only evidence that Bell points to as being an unequivocal statement of his desire to represent himself is a letter attached as an appendix to his pro se postconviction motion. The document is an unaddressed, handwritten copy of a letter to the trial judge dated March 1, 1995, which states:
I am writing again, in regards to my ineffective counsel. Our investigator, Mr. Mark Don [sic] has just advise me, not to give him the addresses to my witnesses, because Mr. Nichols told him, that he do not need them. Mr. Nichols has no ideal [sic] how vital these witnesses could be. Mr. Nichols still has not talk to me about our defense and etc. I do not want him as my attorney. "I would like to represent myself." And would like to have access to make a legal phone call to hire my own attorney.
There is no indication in the trial record that the trial judge ever received this letter or was made aware of its contents. On March 6, 1995, Bell filed a motion for his attorney to withdraw because of a conversation Bell had had with his attorney, which Bell asserts the brother of one of the State's witnesses overheard. Bell also asserted that Nichols continued to show no interest in his trial or defense. Nichols stated that the defense investigator, Don Marks, had made numerous trips to the jail to discuss matters with Bell and had diligently sought out those witnesses that Bell asked him to investigate. The trial court denied Bell's motion for new counsel. At no point during that hearing, supposedly five days after Bell wrote the above letter, did Bell mention the letter or that he wished to represent himself. There is no evidence as to whether the trial judge received this letter. More importantly, since it was not a part of the trial record, appellate counsel was not ineffective for failing to reference it at oral argument. Therefore, we deny Bell's first claim of ineffective assistance of appellate counsel.
Bell next asserts that appellate counsel rendered ineffective assistance in failing to raise on direct appeal the trial court's error in excusing a prospective juror for cause. This alleged error was not objected to by trial counsel, and in the absence of fundamental error, appellate counsel has no obligation to raise an issue that was not preserved for review. See Rutherford v. Moore, 774 So.2d 637, 646 (Fla.2000). Fundamental error is error that "reach[es] down into the validity of *77 the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Kilgore v. State, 688 So.2d 895, 898 (Fla.1997) (quoting State v. Delva, 575 So.2d 643, 644-45 (Fla.1991)).
Bell's claim concerns a prospective juror who was excused for cause without objection because the State noted that he did not seem competent enough to serve as a juror. The record in this case shows that the trial judge did not commit manifest error in excusing the prospective juror for cause. The prospective juror seemed confused about several of the questions asked of him during voir dire. He also reported that he had trouble remembering his previous place of employment because he had suffered a stroke. Given these record facts and recognizing that the trial court, defense counsel, and the prosecutor were all able to observe the prospective juror speak and his actions, we do not find this excusal for cause to be fundamental error. Therefore, we deny Bell's claim that appellate counsel was ineffective for failing to raise this issue.
Bell asserts that appellate counsel was ineffective for failing to raise on direct appeal the fundamental error that he was forced to wear his prison uniform in front of the prospective jury during voir dire. In asserting a claim for ineffective assistance of appellate counsel, "[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based." Freeman, 761 So.2d at 1069. Moreover, "[t]he failure to raise a meritless issue does not constitute ineffective assistance of counsel." Fennie v. State, 855 So.2d 597, 607 (Fla.2003). "In fact, appellate counsel is not required to raise every conceivable nonfrivolous issue." Id.
The trial record clearly refutes Bell's contentions. Bell was not compelled to wear his prison uniform but instead refused to wear the clothes provided to him by the public defender. At no point was any reason given for this refusal other than that he did not want to wear previously used clothing. These facts are entirely distinguishable from the caselaw cited by Bell which holds that a defendant's constitutional rights are violated when he is compelled to wear a prison uniform at trial. Estelle v. Williams, 425 U.S. 501, 502, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976) (defendant's request to wear his civilian clothes at trial was denied). The record is clear that trial counsel attempted to obtain Bell's own clothing but that he was not able to reach any members of Bell's family. Therefore, because Bell fails to point to any error that was fundamental, we find that he has failed to demonstrate that appellate counsel was ineffective.
Bell next claims that his appellate counsel rendered ineffective assistance as a result of a conflict of interest. In considering an ineffective assistance claim based on a purported conflict of interest, we have stated:
Initially, we acknowledge that the right to effective assistance of counsel encompasses the right to representation free from actual conflict. See Strickland, 466 U.S. at 688[, 104 S.Ct. 2052]; Cuyler v. Sullivan, 446 U.S. 335, 349[, 100 S.Ct. 1708, 64 L.Ed.2d 333] (1980). However, in order to establish an ineffectiveness claim premised on an alleged conflict of interest the defendant must "establish that an actual conflict of interest adversely affected his lawyer's performance." Cuyler, 446 U.S. at 350[, 100 S.Ct. 1708]; see also Quince v. State, 732 So.2d 1059, 1065 (Fla.1999). A lawyer suffers from an actual conflict of interest when he or she "actively represent[s] conflicting interests." Cuyler, *78 446 U.S. at 350[, 100 S.Ct. 1708]. To demonstrate an actual conflict, the defendant must identify specific evidence in the record that suggests that his or her interests were compromised. See Herring v. State, 730 So.2d 1264, 1267 (Fla.1998). A possible, speculative or merely hypothetical conflict is "insufficient to impugn a criminal conviction." Cuyler, 446 U.S. at 350[, 100 S.Ct. 1708]. "[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." Id. If a defendant successfully demonstrates the existence of an actual conflict, the defendant must also show that this conflict had an adverse effect upon his lawyer's representation. See Strickland, 466 U.S. at 692[, 104 S.Ct. 2052]; Cuyler, 446 U.S. at 350[, 100 S.Ct. 1708].
The question of whether a defendant's counsel labored under an actual conflict of interest that adversely affected counsel's performance is a mixed question of law and fact. See Cuyler, 446 U.S. at 342[, 100 S.Ct. 1708]; Quince, 732 So.2d at 1064. Once a defendant satisfies both prongs of the Cuyler test, prejudice is presumed and the defendant is entitled to relief. See Strickland, 466 U.S. at 692[, 104 S.Ct. 2052]; Cuyler, 446 U.S. at 349-50[, 100 S.Ct. 1708].
Hunter v. State, 817 So.2d 786, 791-92 (Fla.2002).
In accordance with this caselaw, we deny Bell's claim. Bell has failed to point to any specific evidence demonstrating that his interests were compromised. His counsel before trial, who was excused due to some unspecified conflict of interest, worked at the Fourth Judicial Circuit Public Defender's Office. On direct appeal to this Court, Bell was represented by W.C. McClain, who worked at the Second Judicial Circuit Public Defender's Office. There is no evidence that Bell's appellate counsel had the same conflict of interest that existed in the Fourth Judicial Circuit Public Defender's Office or that any alleged conflict specifically affected Bell's interests. Therefore, we deny this claim.
Bell asserts that appellate counsel should have raised on direct appeal the trial court's error in its instructions to the jury on excusable homicide. However, this unobjected-to jury instruction was a standard instruction that has not been invalidated by this Court. See Std. Jury InstructionsCriminal Cases No. 92-1, 603 So.2d 1175, 1187-88 (Fla.1992). We have held that "trial counsel's failure to object to standard jury instructions that have not been invalidated by this Court does not render counsel's performance deficient." Thompson v. State, 759 So.2d 650, 665 (Fla.2000). Thus, appellate counsel was not ineffective for failing to raise this issue. Each of the cases cited by Bell is distinguishable. See, e.g., Cummings v. State, 648 So.2d 166, 167 (Fla. 4th DCA 1994) (jury instruction read in such a way that dangerous weapon clause modified all three circumstances); Evans v. State, 572 So.2d 20, 20 (Fla. 4th DCA 1990) (same).
Bell asserts that appellate counsel was ineffective for failing to argue on direct appeal that the prosecutor's comments during voir dire were reversible error. The prosecutor stated during voir dire that "no matter what the jury recommends, jury can recommend life, and the Judge can impose death, and the reverse is true, the jury could recommend life and the Judge could " Following an overruled objection from defense counsel, the prosecutor stated that the "jury's recommendation must be given and will be given great weight . . . by the Judge." Appellate counsel is not deemed ineffective for failing to raise claims that have little chance *79 for success on appeal. This isolated comment, made during voir dire before the presentation of evidence in the guilt phase even began, does not rise to the level of reversible error. Thus, Bell has failed to demonstrate that appellate counsel was ineffective for failing to raise this claim.
Bell next argues that Florida's sentencing statute violates the United States Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), that the jury and not the judge must find beyond a reasonable doubt any element which increases the maximum prison sentence. This Court has repeatedly rejected this contention in similar cases, particularly when one of the aggravating factors, a prior violent felony, is based on a contemporaneous murder that was charged in the indictment and the defendant was convicted by a unanimous jury. See Doorbal v. State, 837 So.2d 940, 963 (Fla.2003). Because this substantive claim clearly is without merit, we also deny Bell's claim to the extent that it raises an ineffective assistance of appellate counsel claim. Appellate counsel is not ineffective for failing to raise a meritless claim.
Bell argues that the jury instructions given in his penalty phase were unconstitutional because they shifted the burden to him to prove that death was inappropriate. He also argues that because he was convicted of robbery, he was automatically eligible for the death penalty upon his conviction due to the murder in the course of a felony aggravator. This argument is without support in the record. Bell was convicted of two counts of first-degree murder, and there is no evidence that the jury was instructed on felony murder. The murder in the course of a felony aggravator was never introduced or argued to the jury.
The trial court gave the standard jury instructions at the penalty phase, which we have repeatedly upheld against attacks of improper burden-shifting such as those made herein by Bell. Thus, appellate counsel was not ineffective for failing to raise any claim relating to these instructions on direct appeal.

IV. CONCLUSION
We affirm the denial of the postconviction motion and deny the petition for a writ of habeas corpus.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] The aggravating factors were: (1) the defendant had previously been convicted of another capital offense or of a felony involving the use or threat of violence to some person; (2) the defendant knowingly created a great risk of death to many persons in committing the crime; and (3) the crime was committed in a cold, calculated, and premeditated (CCP) manner without any pretense of moral or legal justification.
[2] The trial court found as a marginal mitigating circumstance that the defendant was under the influence of an extreme mental or emotional disturbance at the time of the crime.
[3] On direct appeal, Bell argued that: (1) the trial court erred in failing to properly inquire whether trial counsel was incompetent and in not permitting the defendant to represent himself; (2) the trial court erred in finding the CCP aggravator; (3) the trial court erred in instructing the jury on CCP; and (4) the trial court erred in failing to properly consider and find mitigating circumstances.
[4] Bell originally filed a pro se notice of appeal to this Court. We ordered the circuit court to appoint counsel for purposes of Bell's appeal here because he may not represent himself in this Court. Bell filed a pro se motion for the discharge of each of the two counsel subsequently appointed to represent him. Each of those attorneys moved to withdraw following Bell's pro se motions because of irreconcilable conflict, and we granted those motions. Bell's third appellate counsel, Christopher Anderson, ultimately represented him before this Court on oral argument. Bell has since filed pro se motions to amend and strike the initial brief filed on his behalf by Anderson. We struck those pro se motions on May 24, 2006. Bell filed a pro se motion to discharge Anderson on June 5, 2006, alleging that he was not happy with the brief filed by Anderson and that Anderson had failed to properly and fully review Bell's case. After the State and Anderson responded to this motion, we denied it on July 13, 2006. We concluded that there was no meritorious basis to discharge Anderson. Bell filed pro se motions for rehearing on his motion to discharge Anderson, and we denied those motions.

Bell also filed in the circuit court a pro se motion to discharge Anderson while the instant appeal was pending in this Court. We affirm the circuit court's finding that it did not have jurisdiction to consider that motion while the instant case was pending in this Court. See State v. Bell, No. 94-9776 CF (Fla. 4th Cir. Ct. order filed April 20, 2007).
[5] Bell raises the following claims in his postconviction appeal: (1) his trial counsel was ineffective for failing to object to the State's comments that Dale George pled guilty to being an accessory to this crime; (2) counsel was ineffective for improperly questioning Margo Bell at the penalty phase regarding the defendant's prior conviction for robbery; (3) counsel was ineffective for advising Bell not to testify; (4) counsel was ineffective in connection with the prosecutor's comments that the State does not seek the death penalty in every first-degree murder case; (5) counsel was ineffective for failing to adequately investigate and obtain the recorded statement of Ericka Williams; (6) counsel was ineffective for failing to produce Andre Mayes as a defense witness; (7) counsel was ineffective for failing to investigate and present a credible defense; (8) counsel was ineffective for making improper closing arguments; (9) counsel was ineffective for allowing the defendant to be shackled in front of jurors; (10) counsel was ineffective in connection with the mental health experts' failure to address all mental competency considerations required by the Florida Rules of Criminal Procedure and in connection with the lack of expert assistance with mental health mitigation issues; (11) counsel was ineffective for conceding guilt and CCP; (12) counsel was ineffective for failing to object to the prosecutor's improper remarks to jurors; (13) counsel was ineffective for failing to object and request a curative jury instruction for the State's incorrect statement of the advisory sentencing procedure; (14) counsel was ineffective for failing to object to comments that diminished the jury's sentencing responsibility, in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); (15) counsel was ineffective for failing to object to the prosecutor's peremptory strike of a prospective juror who had conscientious objections to the death penalty; (16) the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by not disclosing prison and law enforcement records of the victim; (17) counsel was ineffective for failing to investigate and prepare for the testimony of Mark Richardson; (18) counsel was ineffective for failing to investigate and prepare for the testimony of Charles Jones; (19) counsel was ineffective for failing to call Andre Mayes to impeach the testimony of Charles Jones; (20) counsel was ineffective for failing to prepare for the testimony of Dale George and Ericka Williams; (21) counsel was ineffective for failing to present any penalty-phase evidence other than the testimony of defendant's mother; (22) counsel was ineffective for failing to ensure that the prospective jurors were sworn; (23) counsel was ineffective for a number of cumulative errors; and (24) the circuit court erred in finding a number of issues to be procedurally barred.
[6] Bell raises the following claims in his petition for writ of habeas corpus: (1) appellate counsel was ineffective for improperly arguing Bell's claim on direct appeal that Bell should have been permitted to represent himself at trial; (2) appellate counsel was ineffective for failing to raise on direct appeal the erroneous excusal for cause of a prospective juror by the trial court; (3) appellate counsel was ineffective for failing to raise on direct appeal the trial court's error in permitting Bell to wear his jail uniform in front of the jury; (4) appellate counsel had a conflict of interest which rendered his assistance ineffective; (5) appellate counsel was ineffective for failing to raise on direct appeal the issue of the trial court's jury instructions; (6) appellate counsel was ineffective for failing to argue on direct appeal that comments made in voir dire were reversible error; (7) Bell's death sentence is unconstitutional under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); and (8) the trial court gave unconstitutional jury instructions.
[7] We conclude that the following claims are procedurally barred, and we reject Bell's arguments that they were improperly summarily denied by the circuit court: (1) the prosecutor's comments regarding jury deliberations were in error; (2) the State suppressed evidence in violation of Brady; (3) the trial court improperly found the aggravating factor that the defendant knowingly created a great risk of death to many persons; (4) the prosecutor made improper remarks to the jury during voir dire; and (5) the trial court erred in consolidating Bell's two charges for trial.
[8] To the extent that Bell asserts that trial counsel conceded the CCP aggravator, this claim is dealt with at subpart II.K of this opinion.
[9] Ericka Williams, Ned Pryor, and Detective Bolena each responded that they did not recall Bell being shackled at trial.